## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IMO DANIEL KLOIBER DYNASTY )    C.A. No. 9685-VCL
TRUST U/A/D DECEMBER 20, 2002      )

## OPINION

Date Submitted: August 1, 2014
Date Decided: August 6, 2014

W. Donald Sparks, II, Chad M. Shandler, Beth Gansen Knight, RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; Matthew P. D'Emilio, Jeremy D. Eicher, Jennifer E. Smith, COOCH & TAYLOR, P.A., Wilmington, Delaware; *Attorneys for Petitioner PNC Delaware Trust Company.*

Kevin G. Abrams, J. Peter Shindel, Jr., Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Petitioner William Nicholas Kloiber.*

Grover C. Brown, Peter S. Gordon, William M. Kelleher, Joseph Bosik IV, Phillip A. Giordano, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Attorneys for Respondent Daniel Joseph Kloiber.*

Michael A. Weidinger, Kevin M. Capuzzi, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; *Attorneys for Respondent Beth Ann Jenkins Kloiber.*

**LASTER, Vice Chancellor.**

In the eyes of the law, respondents Daniel Joseph Kloiber and Beth Ann Jenkins Kloiber remain husband and wife. They have separated and are parties to a contested divorce proceeding pending in Kentucky before the Fayette Family Circuit Court (the "Kentucky Family Court"). That case has been tried, and a decision is expected soon.

Until recently, Dan[1] was the primary beneficiary and Special Trustee of the Daniel Kloiber Dynasty Trust (the "Dynasty Trust"). The Special Trustee has exclusive authority to instruct the trustee of the Dynasty Trust (the "Trustee") on making distributions and investing the Dynasty Trust's assets. The Trustee only can act to the extent instructed by the Special Trustee. Dan also served as the sole manager of three limited liability companies whose member interests constituted assets of the Dynasty Trust. The Trustee cannot exercise control over the LLCs unless instructed by the Special Trustee.

During the divorce proceeding, the Kentucky Family Court issued status quo orders designed to prevent the parties from dissipating marital assets before the court could determine ownership and allocate the assets equitably. The status quo orders restricted Dan in his capacity as a human being over whom the Kentucky Family Court

---

[1] Many individuals with the surname Kloiber appear in this decision. This decision identifies each individual's full name when that person first appears. After that, for simplicity and to avoid confusion, this decision uses the individual's given name. The parties consistently refer to Daniel as "Dan" and to William Nicholas Kloiber as "Nick," so this decision uses those shortened forms. The use of first names does not imply familiarity and intends no disrespect.

1

had personal jurisdiction, thereby restricting his actions in his other capacities, such as Special Trustee or sole manager of the LLCs.

On May 15, 2014, Dan resigned as Special Trustee, and on May 29, he resigned as sole manager of the LLCs. He appointed Nick as Special Trustee. Nick proceeded to take action contrary to the status quo orders. The Kentucky Family Court issued a rule to show cause why Nick should not be held in contempt (the "Rule to Show Cause").

PNC Delaware Trust Company ("PNC") is currently the Trustee. PNC and Nick have filed petitions seeking instructions and declarations from this court (the "PNC Petition" and the "Special Trustee Petition," respectively). They contend that the Kentucky Family Court has asserted jurisdiction improperly over the Trustee, the Special Trustee, and the Dynasty Trust and is requiring them to take actions contrary to the trust agreement and their fiduciary duties. They argue that this court has primary jurisdiction over the Dynasty Trust and must intervene to curb the perceived excesses of the Kentucky Family Court. Most pressingly, Nick seeks a temporary restraining order ("TRO") that would prevent Beth from seeking to enforce the status quo orders, including through the pending Rule to Show Cause. This decision denies Nick's application.

## I. FACTUAL BACKGROUND

The facts for purposes of this decision are drawn from the pleadings, two motions to expedite, the motion for a TRO, a motion for a status quo order, the supporting exhibits to these documents, and representations made by counsel. What follows are not formal factual findings, but rather how the facts appear at this early stage.

2

## A.    The Dynasty Trust

On December 20, 2002, Glenn F. Kloiber settled the Dynasty Trust.  Glenn is Dan's father.  The instrument governing the Dynasty Trust is an irrevocable trust agreement dated December 20, 2002, between Glenn and PNC Bank, Delaware (the "Trust Agreement" or "TA").  PNC is the successor to PNC Bank, Delaware.

The Trust Agreement selects Delaware as the original situs for the Dynasty Trust. TA § 10.2.  As long as Delaware is the situs, the Trust Agreement calls for Delaware law to govern the "[t]he validity, construction and effect of the provisions" of the Dynasty Trust and for the Dynasty Trust to be "administered in accordance with the laws of Delaware." *Id.* § 10.1.

The Trust Agreement actually creates two trusts:  an Exempt Trust and a Non-Exempt Trust.  The division is an estate planning vehicle designed to minimize the amounts the federal government can collect under the generation-skipping transfer tax. The Exempt Trust holds assets that are exempt from the generation-skipping transfer tax. The Non-Exempt Trust holds all other assets.  The distinction is not relevant to this decision, which will refer simply to the Dynasty Trust and the trust assets without distinguishing between the trusts.  The Trust Agreement also contemplates the possible creation of additional trusts.  No one has identified any, so this decision assumes none exist.

The Trust Agreement awkwardly refers throughout to the "Grantor's son." Section 13.3 clarifies matters by providing that "[a]ll references in this Trust Agreement to the 'Grantor's son' are to **DANIEL J. KLOIBER.**" *Id.* § 13.3.  The Trust Agreement

also awkwardly refers throughout to the "children of the Grantor's son" and the "Grantor's son's children." Section 13.5 helpfully states that these phrases refer to Dan's four sons and identifies them by name. *Id.* § 13.5.

The Trust Agreement takes a noticeably different approach with the term "wife of the Grantor's son," which also appears throughout the Trust Agreement. Although the Dynasty Trust was created and funded while Dan and Beth were married, the Trust Agreement does *not* equate "wife of the Grantor's son" with Beth. Instead, Section 13.4 defines "wife of the Grantor's son" in the following transitory terms:

> All references in this Trust Agreement to the "wife of the Grantor's son" or to the "Grantor's son's wife" are, during the Grantor's son's lifetime, to the person to whom the Grantor's son is legally married and with whom the Grantor's son is then cohabiting or, subsequent to the Grantor's son's death, the person to whom the Grantor's son was legally married on the date of his death. The Grantor's son is currently legally married to **BETH J. KLOIBER.**

*Id.* § 13.4. Beth is thus never defined as the "wife of the Grantor's son." The Trust Agreement simply observes that when the Trust Agreement was executed, Dan was "currently legally married to Beth." Dan, Nick, and PNC have taken the position that Beth only qualified as the "wife of the Grantor's son" as long as she was *both* legally married to *and* cohabiting with Dan. As soon as she and Dan stopped cohabiting, Beth stopped being the "wife of the Grantor's son." If the Kentucky Family Court grants Dan and Beth a divorce, that will reinforce Beth's non-wife status. Except as the "wife of the Grantor's son," Beth has no rights under the Dynasty Trust.

Dan is the primary beneficiary of the Dynasty Trust. During each calendar year, he has the right to withdraw up to five percent of the net fair market value of the trust

4

estate. *Id.* § 1.1.1. He also has special powers of appointment, exercisable during his lifetime or in his will, that permit him to appoint the principal of the trust estate to the "wife of the Grantor's son," to what are essentially Dan's blood relations (his children and their issue, or his siblings and their issue), or to a charitable organization. *Id.* §§ 1.1.8, 1.1.9. In addition, the Trustee "shall pay to or apply for [Dan's] benefit" such amounts as "shall be necessary or advisable from time to time for [Dan's] health, education, support and maintenance." *Id.* § 1.1.3. The Trustee also may use funds from the trust estate to provide and maintain a personal residence for Dan. *Id.* § 1.1.7.

The "wife of the Grantor's son" is also a beneficiary of the Dynasty Trust. During Dan's lifetime, the Trustee "shall pay to or apply for [her] benefit" such amounts as "shall be necessary or advisable from time to time for [her] health, education, support, and maintenance." *Id.* § 1.1.4. After Dan's death, and to the extent he did not exercise his testamentary power of appointment, the "wife of the Grantor's son" receives rights similar to those held by Dan during his lifetime, including the five percent withdrawal right, funds for a personal residence, and the special powers of appointment. *Id.* § 1.1.10.

Dan's children and their children are also beneficiaries. During Dan's lifetime and, if she lives longer than Dan, the lifetime of the "wife of the Grantor's son," the Trustee "shall pay to or apply for [their] benefit" such amounts as "shall be necessary or advisable from time to time for [their] health and education." *Id.* § 1.1.5. After the death of whoever was the "wife of the Grantor's son" at the time of Dan's death, and to the extent the "wife of the Grantor's son" did not exercise her testamentary power of appointment, the Trust Agreement provides for the remaining trust estate to be

5

subdivided into additional trusts and distributed to Dan's descendants in prescribed amounts at prescribed times. *Id.* § 1.1.10(i).

**B.    The Roles Of The Trustee, Special Trustee, Advisory Committee, Holder, And Trust Protector**

The Trust Agreement establishes a series of roles, each with specific powers. The roles include the Trustee, the Special Trustee, the Advisory Committee, the Holder, and the Trust Protector.

Nick contends in his petition that PNC "has very broad powers with respect to the administration of the Trust." Special Trustee Petition ¶ 3. This is true, after a fashion. The Dynasty Trust is a directed trust. This means that although Article FOURTH of the Trust Agreement appears to give the Trustee very broad powers, the Trustee cannot actually exercise any of those powers unless instructed by someone in one of the other roles, and then only to the extent instructed. Thus, under Section 4.6, the Trustee is entitled to exercise all investment and management powers granted to it "only upon the written direction of the Special Trustee." TA § 4.6. When exercising its authority as directed by the Special Trustee, the Trustee "shall be under no duty to inquire into or monitor, and shall have no liability of any kind with respect to, the investment of the trust assets or the directions of the Special Trustee or the Advisory Committee." *Id.* Likewise, under Section 4.7, the Trustee has the power to own Special Holdings, which are defined as shares of non-public entities, but the Trustee is only permitted to act "with respect to the retention, voting, purchase, sale, exchange, tender, and other transactions affecting the ownership of Special Holdings" if it has received "the written direction of the Special

6

Trustee." *Id.* § 4.7. The same is true for discretionary distributions. Despite nominally having the power to make distributions for the benefit of Dan and other beneficiaries, Section 4.8 states that "the Trustee shall not make any discretionary distributions (including distributions made pursuant to a standard) . . . or exercise any power of the Trustee to allow the use or consumption of any asset held as a part of the trust estate . . . except upon the written direction of the Special Trustee." *Id.* § 4.8.

The Trust Agreement removes from the Trustee all fiduciary duties that a trustee traditionally would owe at common law. It waives the duty of loyalty, the rule against self-dealing, and the "prudent person" standard that ordinarily would apply. *See id.* § 4.3. It also waives duties of disclosure that the Trustee otherwise would owe. *See id.* §§ 4.1, 5.11. The Trust Agreement nevertheless purports to confirm that "[e]very act done, power exercised or obligation assumed by the Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Trustee acting in a fiduciary capacity and not otherwise." *Id.* § 4.4.

This usage of the term "fiduciary capacity" is a radical one that anyone familiar with the common law concept would have difficulty recognizing. Rather than meaning that the Trustee is actually acting as a fiduciary on behalf of a *cestui que trust*, the Trust Agreement conceives of this role as a liability-limiting device. Thus, after stressing the Trustee's "fiduciary capacity," Section 4.4 of the Trust Agreement continues by identifying the following implication of this term, at least as the drafters of the Trust Agreement conceived it:

> [E]very person, firm, corporation or other entity contracting or otherwise dealing with the Trustee shall look only to the funds and property of the trust estate for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Trustee shall not be individually liable therefor even though the Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust estate.

*Id.*; *see also id.* § 4.3 (explaining that the Trustee "shall exercise all of the Trustee's powers and authority under this Agreement solely in a fiduciary capacity and shall only be liable for any loss incurred by any trust hereunder caused by the Trustee's own willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust").

Section 5.9 of the Trust Agreement, entitled "Duties of Trustee," sets forth the actual duties that the Trustee is expected to carry out without explicit instructions from someone acting in one of the other roles. It states that "[i]n addition to the Trustee's other duties hereunder," which have been summarized above, the Trustee shall have the following "exclusive duties":

> (i) to maintain or arrange for custody, in the jurisdiction serving as situs of the trust, of some or all of the trust property; (ii) to maintain records for the trust on an exclusive or nonexclusive basis; and (iii) to prepare or arrange for the preparation of fiduciary income tax returns for the trust.

*Id.* § 5.9. That is all the Trustee actually does.

The standard of care that applies to the Trustee further emphasizes its limited role.

Section 5.11 of the Trust Agreement states:

> The Trustee shall be liable hereunder only for the Trustee's willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Trustee shall not be

personally liable for acts of any other fiduciary acting herein, nor for making any delegation that is authorized under this Agreement, nor for any action taken without the Trustee's express agreement, nor for any failure to act, absent willful misconduct. The Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Trustee by any entity in which the trust estate holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

*Id.* § 5.11.

The Special Trustee stands at the other end of the power spectrum. The Trust Agreement named Dan as the Special Trustee and gave him the power to appoint a successor or substitute Special Trustee. *Id.* § 8.1. As noted, the Trustee cannot exercise the powers it nominally holds except at the direction of the Special Trustee. Article NINTH reiterates and reinforces the allocation of authority by granting the Special Trustee the following powers:

- Sole authority to direct the Trustee with respect to investment of the trust estate, *id.* § 9.1;

- Sole authority to direct the Trustee with respect to Special Holdings, *id.* § 9.2;

- Sole authority to direct the Trustee with respect to discretionary distributions, *id.* § 9.3; and

- Sole authority to remove and replace the Trustee, *id.* § 9.4.

The Special Trustee can remove the Trustee "at any time, without or without cause." *Id.* § 5.2.

The Advisory Committee is the backstop to the Special Trustee. The Trust Agreement names Dan's brother and his two brothers-in-law as the members of the Advisory Committee. *Id.* § 7.1. It has the same powers to direct, remove, and replace the Trustee as the Special Trustee. *See id.* §§ 7.2-7.5. Language found in more specific

9

sections of the Trust Agreement indicates that the Advisory Committee can exercise its powers only if there is no Special Trustee. *See id.* §§ 4.6-4.8. After Dan's death, the Advisory Committee gains the power to appoint a successor Trust Protector and to remove and replace any successor Trust Protector. *Id.* § 7.6.

The "Holder" is a singular term used to refer to a group currently comprising Dan's three siblings and their spouses. *Id.* § 6.1. Although it looks and sounds like a committee, and although the persons named as the Holder could act jointly, any one person having Holder status can exercise the Holder's authority individually. Most importantly, the Holder has a special power to appoint as much of the principal of the trust estate as the Holder deems fit at any time for Dan's benefit, the benefit of his issue, or the benefit of the "wife of the Grantor's son." *Id.* Generally speaking, the Holder feature means that if Dan asks, and if any one of his three siblings or their spouses agrees, then Dan can access the principal of the trust estate.

The Trust Protector has limited and specific powers. The Trust Agreement identifies one of Dan's brothers-in-law as the initial Trust Protector and gives Dan the power to appoint his successor. *Id.* § 5.13. The Trust Protector can confer "additional powers and authority" on the Trustee to the extent "necessary or desirable, in the sole judgment of the Trust Protector, for prompt and effective administration of the trusts" and has the power to "amend any portion of this Agreement" for that purpose, except for certain enumerated provisions inserted for the protection of the Trustee. *Id.* § 5.12. The Trust Protector also has the power to re-constitute the Advisory Committee if it ever has no members. *Id.* § 7.1. Perhaps more significantly, the Trust Protector can change the

10

situs of the Dynasty Trust by transferring the Dynasty Trust to a new jurisdiction and electing to have the Dynasty Trust "administered exclusively under the laws of . . . the jurisdiction to which it has been transferred." *Id.* § 10.2. Technically the Trustee must consent to the change of situs, but that requirement can be sidestepped by having the Special Trustee remove the existing Trustee and appoint a Trustee in the new jurisdiction.

## C. The Funding Of The Dynasty Trust

Glenn initially funded the Dynasty Trust in 2002 with approximately $15,000. The Trust Agreement provides that any individual can contribute property to the Dynasty Trust. TA § 14.1. In early 2003, Dan sold 99.45% of his shares of Exstream Software, Inc. ("Exstream") to the Dynasty Trust for an unsecured promissory note with a face amount of $6 million.

In June 2007, the Dynasty Trust sold approximately 80% of its Exstream holdings to American Capital Strategies, Ltd. for approximately $250 million. In March 2008, the Dynasty Trust sold its remaining holdings in Exstream to Hewlett-Packard Company for approximately $60 million.

The trust estate currently consists of cash, marketable securities, and interests in closely held entities. The closely held entities include limited liability companies in which the Dynasty Trust owns the entire member interest. The three principal entities appear to be Kloiber Investments, LLC, Kloiber Holdings, LLC, and Kloiber Real Estate Holdings, LLC, and until recently, Dan served as the sole manager of those LLCs. Under the Trust Agreement, the LLCs appear to constitute "Special Holdings" over which the Trustee cannot exercise any control without specific instructions from the Special

11

Trustee. The principal entities appear in turn to own stakes in other entities. The record before this court does not identify all of the entities or reveal the nature or extent of the Dynasty Trust's ownership.

**D.      The Kentucky Proceedings**

Dan and Beth separated in April 2010, and Dan filed for divorce on December 9, 2010 (the "Kentucky Divorce Proceeding"). Dan took the position that when the couple separated, Beth stopped qualifying as a beneficiary under the Trust Agreement because she was no longer the "wife of the Grantor's son" as defined in the Trust Agreement. Beth countered that the assets of the Dynasty Trust were marital property subject to equitable division in the Kentucky Divorce Proceeding.

On August 15, 2011, the Kentucky Family Court entered a status quo order designed to prevent the dissipation of marital assets pending the outcome of the divorce proceeding. The order provided that

> [e]xcept as shall be necessary to pay reasonable living expenses, neither party shall sell, encumber, gift, bequeath or in any manner transfer, convey or dissipate any property, cash, stocks or other assets currently in their possession or control of another person, company, legal entity or family member without an order of the Court or an agreed order signed by both parties or their attorneys.

PNC Petition Ex. D (the "2011 Status Quo Order"). On July 20, 2012, the Kentucky Family Court entered a status quo order that identified the Dynasty Trust as an asset subject to the 2011 Status Quo Order. PNC Petition Ex. E (the "2012 Status Quo Order"). The 2012 Status Quo Order established procedures for the parties to follow

12

whenever either side wanted to engage in an action or transaction involving $50,000 or more, "including, but not limited to, transactions within the [Dynasty Trust]." *Id.* at 2.

When these orders were entered, the Trustee and the Dynasty Trust were not parties to the Kentucky Divorce Proceeding. Dan was a party, and at the time, he was the Special Trustee with full power to direct the Trustee as to investment decisions, distributions, and control over the Special Holdings. By restricting Dan, the Kentucky Family Court restricted the Dynasty Trust, thereby ensuring that its assets would not be dissipated before the Kentucky Family Court issued its decision. There is no indication that Dan raised any contemporaneous objection to the entry of the 2012 Status Quo Order, the express extension of the terms of the 2011 Status Quo Order to the Dynasty Trust, or the need to follow the procedures set out by the Kentucky Family Court. To the contrary, the record indicates that Dan followed those procedures for transactions inside the Dynasty Trust.

Also in 2012, Beth initiated a plenary action in an effort to void Dan's transfers to the Dynasty Trust. On November 18, 2012, Beth filed suit in the Fayette Circuit Court, Civil Branch, Division Four (the "Kentucky Circuit Court") against Dan, the Dynasty Trust, PNC as Trustee, and the drafters of the Trust Agreement. In her complaint, Beth alleged that Dan's sale of Exstream stock to the Dynasty Trust constituted a fraudulent transfer. Beth also amended her response in the Kentucky Divorce Proceeding to assert her fraudulent transfer claim. By order dated February 22, 2013, the Kentucky Circuit Court dismissed Beth's plenary complaint. As to PNC, the Kentucky Circuit Court held that it lacked personal jurisdiction. Beth filed an appeal, which remains pending.

13

**E.     The Trial In The Kentucky Divorce Proceeding And The 2013 Status Quo Order**

The Kentucky Divorce Proceeding was tried over twelve days in June, July, and August 2013. On September 18, 2013, the Kentucky Family Court entered a further order designed to extend the earlier status quo orders and keep them in full force and effect until the entry of a final decree. PNC Petition Ex. F (the "2013 Status Quo Order"). This decision refers to the 2011, 2012, and 2013 Status Quo Orders collectively as the "Kentucky Status Quo Orders."

The 2013 Status Quo Order provided that

> in addition to the prohibitions of the Status Quo Order as currently entered by the Court, [Dan] is further prohibited from taking action to facilitate, request or procure any change in any of the liquid, cash or cash equivalent investments within the [Dynasty Trust], or within the entities within the [Dynasty Trust] without prior agreement of [Beth] or Order of the Court.

2013 Status Quo Order at 1. Despite this general prohibition, the 2013 Status Quo Order authorized Dan to make three specific investments totaling $5.5 million in the aggregate using the liquid assets of the Dynasty Trust. *Id.* at 2. After authorizing these investments, the 2013 Status Quo Order reiterated that Dan otherwise was "prohibited from undertaking any actions which will change the liquid, cash and cash equivalent investments within the [Dynasty Trust], or within the entities within the [Dynasty Trust]" without Beth's prior agreement or court approval. *Id.*

As with the earlier orders, the Trustee and the Dynasty Trust were not parties to the Kentucky Divorce Proceeding when the 2013 Status Quo Order was entered. Dan was, and he was still serving as Special Trustee. As noted, Dan previously had been

14

complying with the Kentucky Status Quo Orders since the initial order was entered in 2011, and he does not appear to have objected to the orders as being beyond the authority of the Kentucky Family Court. But on October 3, 2013, Dan sought a writ of prohibition from the Kentucky Court of Appeals that would prevent the enforcement of the Kentucky Status Quo Orders.

By opinion dated February 27, 2014, the Kentucky Court of Appeals denied the writ, holding that the Kentucky Family Court had subject matter jurisdiction over the divorce proceeding and that any failure to join the Dynasty Trust, Trustee, Special Trustee or other beneficiaries of the Dynasty Trust could be remedied on direct appeal. The decision of the Kentucky Court of Appeals aptly described Dan as the "primary beneficiary" of the Dynasty Trust, noted that he was also Special Trustee of the Dynasty Trust and the manager of Kloiber Holdings, LLC, and described Kloiber Holdings, LLC as "a company wholly owned by the trust" having assets that "exceed two hundred million dollars." *Kloiber v. Masterton*, No. 2013-CA-001701-OA, at 2 (Ky. Ct. App. Feb. 27, 2014).

On March 27, 2014, the Kentucky Family Court informed the parties that it was planning to add the Dynasty Trust as a party to the divorce proceeding. On April 28, Beth sought to add PNC as a party.

## F. The Changing Of The Guard

On May 15, 2014, Dan executed a document in which he resigned as Special Trustee and exercised his authority to appoint Nick as his successor. In the very same document, Nick accepted his appointment as Special Trustee. Dan also resigned from his

15

positions as the sole manager of the principal entities within the Dynasty Trust, including Kloiber Investments, LLC, Kloiber Holdings, LLC, and Kloiber Real Estate Holdings, LLC. Dan did not notify the Kentucky Family Court of these developments.

On May 20, 2014, Nick exercised his authority as Special Trustee to direct PNC to transfer $100,000 from the Dynasty Trust's account at PNC to a bank account at PNC referred to as the Kloiber Shack Construction Account. Nick informed PNC that in his capacity as Special Trustee, he had "sole authority to direct the Trustee with respect to the investment of the entire Trust estate." He stated that Kloiber Shack, LLC, which appears to be an entity owned indirectly by the Dynasty Trust, would use the $100,000 to continue developing real property located at 1040 South Ocean Boulevard, Manalapan, Florida, which Nick represented was owned by the Dynasty Trust.

Nick did not obtain consent from Beth or the Kentucky Family Court. Nick takes the view that the Kentucky Status Quo Orders did not bind him, both because he was not a party to the Kentucky Divorce Proceeding and because the Kentucky Family Court lacked jurisdiction to enter orders governing the administration of the Dynasty Trust.

### G. The PNC Petition

On May 22, 2014, two days after receiving Nick's instruction about the $100,000, PNC filed the PNC Petition in this court. PNC sought declarations that this court has exclusive jurisdiction over matters of Trust administration, that PNC may rely on instructions from the Special Trustee, and that Beth's fraudulent conveyance claim is time-barred. In its petition, PNC took the position that Beth is no longer the "wife of the Grantor's son" for purposes of the Dynasty Trust. Most significantly, PNC sought a

16

declaration that the Kentucky Family Court's orders are not enforceable against PNC or the Dynasty Trust.

Nick responded to PNC's petition. With one exception, Nick admitted all of the allegations in the petition or did not dispute them. In the lone exception, Nick denied the allegation that Dan's transfer of Exstream stock to the Dynasty Trust was a qualified disposition under Delaware law. Nick's response did not address provisions in the Trust Agreement which suggest that all transfers to the Dynasty Trust were intended to be qualified dispositions. For example, Article TWELFTH of the Trust Agreement states: "The Trustee is authorized to modify or amend the provisions of this Agreement, upon the direction of the Trust Protector, to ensure that any property contributed to any trust created under this Agreement shall be the subject of a qualified disposition within the meaning of . . . the Delaware Code." TA art. XII.

## H. Further Proceedings In The Kentucky Family Court

On May 23, 2014, the Kentucky Family Court learned that Dan was no longer Special Trustee. This development understandably concerned the Kentucky Family Court, because the Kentucky Status Quo Orders preserved the status quo over the assets of the Dynasty Trust by restraining Dan from taking action in his various capacities. As a step towards re-establishing a measure of control over the assets it would be ruling on, the Kentucky Family Court entered an order on May 23 that added both PNC and the Dynasty Trust as parties to the Kentucky Divorce Proceeding. Beth then amended her response to Dan's divorce petition to name PNC as an additional respondent and to seek relief from PNC. PNC moved to dismiss, contending in part that the Kentucky Family

Court cannot exercise personal jurisdiction over it and that the remedies Beth seeks fall within the exclusive jurisdiction of this court.

By order entered June 18, 2014, the Kentucky Family Court added Nick and any successor Special Trustee as parties to the Kentucky Divorce Proceeding. This was another understandable effort by the Kentucky Family Court to re-establish the control over the Dynasty Trust assets that the court previously exercised through Dan. This court has been informed that efforts to serve Nick have been unsuccessful to date. The Kentucky Family Court also directed Dan to provide proof that the Dynasty Trust continued to hold all of its assets.

After a hearing on July 11, 2014, the Kentucky Family Court ordered Dan "to immediately revoke his previous resignation dated May 15, 2014 as Special Trustee of the Daniel Kloiber Dynasty Trust and immediately reconstitute himself as Special Trustee . . . by July 14, 2014 at close of business." Special Trustee Petition Ex. K ¶ 2. Later that day, Dan sent Nick a letter purporting to revoke his resignation as Special Trustee and asking Nick to recognize Dan as Special Trustee or, if necessary, reappoint Dan as Special Trustee.

On July 14, 2014, Nick provided his father with an affidavit stating that Dan's resignation and Nick's appointment as Special Trustee were valid and that Dan could not revoke them. Nick took the position that he could not resign and reappoint his father because Nick had a fiduciary duty to act in the best interests of all beneficiaries of the Dynasty Trust and because resigning and reappointing Dan would constitute a breach of his fiduciary duties. After a hearing on that date, and in light of Dan's failure to comply

18

with its order, the Kentucky Family Court held Dan in contempt. The Kentucky Family Court also issued the Rule to Show Cause against Nick.

Dan sought expedited appellate review of the contempt finding. Minutes before Dan was scheduled to be incarcerated, the Kentucky Court of Appeals stayed the contempt order. The stay did not address the Rule to Show Cause.

## I. Further Proceedings In This Court

The actions taken by the Kentucky Family Court after learning of Dan's resignations and Nick's appointment as Special Trustee prompted a reactive flurry of activity in this court. On June 20, 2014, PNC amended its petition to seek declarations regarding the Kentucky Family Court's orders asserting personal jurisdiction over PNC. PNC asked this court to declare, among other things, that this court has exclusive jurisdiction with respect to the Exstream transaction, to the exclusion of the Kentucky Family Court, and that PNC is not bound to follow any of the Kentucky Status Quo Orders. Dan filed a response in which he admitted or declined to dispute the allegations of the amended petition, except for the allegation that the transfer of Exstream stock to the Dynasty Trust was a qualified disposition.

On July 8, 2014, Beth moved for a status quo order in PNC's action and sought expedited consideration of her motion. This decision does not address her motion, which the court has ruled on separately.

On July 21, 2014, Nick filed the Special Trustee Petition. He moved for a TRO and sought expedited consideration of his application. PNC's action and Nick's action have since been consolidated. This decision addresses Nick's application for a TRO.

19

## II. LEGAL ANALYSIS

Nick seeks a TRO that would act as an anti-suit injunction, blocking Beth from attempting to enforce the Kentucky Status Quo Orders. He claims that "[i]n a nutshell, the Kentucky Family Court is engaging in undue interference with this Court's primary supervision over the Dynasty Trust and disregarding due process in an attempt to arrogate to itself control over the administration of the Trust." Motion ¶ 3. The Kentucky Family Court is trying to accomplish this, Nick says, by "conscripting the Special Trustee, over whom the Kentucky Family Court does not have personal jurisdiction, through the threatened sanction of contempt and potential imprisonment." *Id.* To remedy the situation, Nick asks this court to issue a TRO

> (a) ruling that this Court has primary supervision of the Trust and will exercise jurisdiction over all issues related to the administration and validity of the Trust, and (b) restraining Beth . . . and [Dan] from attempting to adjudicate or otherwise attempting to use legal process in any proceeding other than before this Court regarding: (i) the validity of [Dan's] resignation as Special Trustee; (ii) the validity of [Nick's] appointment as Special Trustee; (iii) [Nick's] authority . . . to direct PNC and the duty of PNC to follow Nick's directions; and (iv) [Nick's] decision not to resign as Special Trustee.

*Id.* ¶ 8.

"A temporary restraining order is a distinctive remedy of a court of equity. It is not a preliminary injunction masquerading under another name and the legal test for its issuance, while involving similar elements to the test for a preliminary injunction, involves . . . a materially different emphasis." *Cottle v. Carr*, 1988 WL 10415, at *2 (Del. Ch. Feb. 9, 1988) (Allen, C.). "In assessing whether a temporary restraining order is warranted, the Court is generally guided by three factors: (i) the existence of a

20

colorable claim, (ii) the irreparable harm that will be suffered if relief is not granted, and (iii) a balancing of hardships favoring the moving party." *CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007). Of the three factors, irreparable harm is the most important; it is the *sine qua non* for this form of relief. *Cottle*, 1988 WL 10415, at *6.

## A. Colorable Claim

Nick argues that the Kentucky Family Court is interfering with this court's jurisdiction. This court has the power to issue injunctive relief to protect its jurisdiction. *See ODN Hldg. Corp. v. Hsu*, 2012 WL 1345487, at *6 (Del. Ch. Mar. 30, 2012). *See generally* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 5.03, at 5-45 to 5-58 (Supp. 2013). But if the Kentucky Family Court is not interfering with this court's jurisdiction, then Nick lacks a colorable claim on which to base a TRO.

### 1. Interference With Exclusive Jurisdiction

Although Nick himself has not advanced this claim specifically, PNC has asserted in its petitions and in support of Nick's application that this court has exclusive jurisdiction over the Dynasty Trust under Delaware's Qualified Dispositions in Trust Act, 12 *Del. C.* §§ 3570-3576 (the "Qualified Dispositions Act"). Section 3572(a) of the Qualified Dispositions Act states:

> Notwithstanding any other provision of this Code, no action of any kind, including, without limitation, an action to enforce a judgment entered by a court or other body having adjudicative authority, shall be brought at law or in equity for an attachment or other provisional remedy against property that is the subject of a qualified disposition or for avoidance of a qualified

disposition unless such action shall be brought pursuant to the provisions of § 1304 or § 1305 of Title 6 and, in the case of a creditor whose claim arose after a qualified disposition, unless the qualified disposition was made with actual intent to defraud such creditor. *The Court of Chancery shall have exclusive jurisdiction over any action brought with respect to a qualified disposition.*

12 *Del. C.* § 3572(a) (emphasis added). PNC interprets this statute as asserting the "exclusive jurisdiction" of this court to the exclusion of all other courts in the world, including the Kentucky Family Court.

Many Delaware statutes state that a particular Delaware court has exclusive jurisdiction over claims brought under that statute. This is because Delaware's court system comprises multiple courts. These provisions assign jurisdiction within the State of Delaware among Delaware's various courts. The trial court of general jurisdiction in Delaware is the Superior Court. Other trial courts, including the Family Court, the Court of Common Pleas, the Justice of the Peace courts, and this court, are courts of limited jurisdiction. By stating that a particular Delaware court has exclusive jurisdiction over a particular statute, the General Assembly makes clear which of Delaware's trial courts will handle the identified matters.[2]

---

[2] *See, e.g.*, 6 *Del. C.* § 4709 (providing that the Justice of the Peace courts have exclusive jurisdiction over actions involving transient retailers); 8 *Del. C.* § 205 (vesting the Court of Chancery with exclusive jurisdiction to hear proceedings to validate defective corporate acts); 10 *Del. C.* § 921 (providing that the Family Court has "exclusive original civil jurisdiction" over proceedings falling within enumerated categories); 10 *Del. C.* § 9301 (providing that the Justice of the Peace courts have exclusive jurisdiction over truancy actions); 13 *Del. C.* § 507 (assigning to the Family Court "exclusive original jurisdiction over all actions arising under this chapter," including actions involving equitable relief, and terminating the jurisdiction of the Court of Chancery over those matters).

In Delaware, specifying that exclusive jurisdiction has been assigned to a court is particularly important because of the residual equitable jurisdiction of the Court of Chancery. The Delaware Supreme Court has held that the Constitution of the State of Delaware created and maintained the Court of Chancery "to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity." *DuPont v. DuPont*, 85 A.2d 724, 729 (Del. 1951). To divest the Court of Chancery of its power to hear a particular class of cases in equity, the General Assembly must both (i) confer "exclusively upon some other tribunal jurisdiction of causes theretofore heard and determined in the Court of Chancery" and (ii) ensure that the remedies provided by the new tribunal are "the equivalent of the remedy available in the Court of Chancery." *Id.* at 729-30. *See generally* Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701, 713-18 (2011) (discussing the *DuPont* case and the constitutional scope of the Court of Chancery's jurisdiction).

The General Assembly also has designated a particular court as having exclusive jurisdiction in order to alter a pre-existing allocation of jurisdiction. For example, actions to compel the production of corporate books and records historically were pursued by seeking a writ of mandamus in the Superior Court. *Shaw v. Agri-Mark, Inc.*, 663 A.2d 464, 466 (Del. 1995). In Sections 220(c) and (d) of the General Corporation Law, the General Assembly assigned the Court of Chancery exclusive jurisdiction over books and records actions. *See* 8 *Del. C.* § 220(c)-(d). Similarly, until 1994, suits seeking advancement and indemnification were heard in the Superior Court because they involved monetary, rather than equitable, relief. *Mass. Mut. Life Ins. Co. v. Certain*

23

*Underwriters at Lloyd's of London*, 2010 WL 3724745, at *5 (Del. Ch. Sept. 24, 2010). The General Assembly re-assigned these matters to the Court of Chancery. *See* 8 *Del. C.* § 145(k).

When a Delaware state statute assigns exclusive jurisdiction to a particular Delaware court, the statute is allocating jurisdiction among the Delaware courts. The state is *not* making a claim against the world that no court outside of Delaware can exercise jurisdiction over that type of case.

Nor, as a matter of power within our federal republic, could the State of Delaware arrogate that authority to itself. Assume that a non-Delaware citizen who served as an officer of a Delaware corporation was successful on the merits in defending a proceeding covered by Section 145(c) of the General Corporation Law. Assume that the non-Delawarean sued the Delaware corporation in federal district court and sought to be indemnified for $1 million. Any challenge to the federal court's jurisdiction based on Section 145(k) conferring exclusive jurisdiction on the Court of Chancery would fail, defeated by the federal diversity statute, 28 U.S.C. § 1331, and the Supremacy Clause of the United States Constitution.[3]

---

[3] *See, e.g.*, *Chicot Cty. v. Sherwood*, 148 U.S. 529 (1893); *Lincoln Cty. v. Luning*, 133 U.S. 529 (1890); *Chi. & N.W. Ry. Co. v. Whitton*, 80 U.S. (13 Wall.) 270 (1871); *Cowles v. Mercer Cty.*, 74 U.S. (7 Wall.) 118 (1868). Whether the federal court might abstain from exercising its jurisdiction presents a different question. *See generally* Leonard Birdsong, *Comity and Our Federalism in the Twenty-First Century: The Abstention Doctrines Will Always Be with Us—Get over It!!*, 36 Creighton L. Rev. 375 (2003) (discussing federal abstention doctrines).

In my view, Delaware also cannot unilaterally preclude a sister state from hearing claims under its law. The fifty states in our federal republic are peers. Although there is no horizontal constitutional mandate so clear as the Supremacy Clause, the Full Faith & Credit Clause comes close. It provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. If Delaware sought to preclude a sister state from hearing a matter of Delaware law, it would not be giving constitutional respect to the judicial proceedings of the sister state.[4] In the converse scenario, the United States Supreme Court has interpreted the Full Faith & Credit Clause as requiring that state courts not only respect the laws of their sister states but also entertain claims under their laws.[5] I do not believe

---

[4] *See Crider v. Zurich Ins. Co.*, 380 U.S. 39, 42-43 (1965) (holding that Alabama state court could entertain claim under Georgia Workmen's Compensation Act even though act conferred exclusive jurisdiction on Georgia Compensation Bureau); *Tenn. Coal, Iron & R.R. v. George*, 233 U.S. 354, 359-60 (1914) (holding that plaintiff could sue in Georgia under Alabama statute that required all actions under the statute to be brought in Alabama and that "a state cannot create a transitory cause of action and at the same time destroy the right to sue on that transitory cause of action in any court having jurisdiction"); *see also* Restatement (Second) of Conflict of Laws § 91 (1971) [hereinafter Restatement (Second)] ("A State may entertain an action even though the state of the applicable law has provided that action on the particular claim shall not be brought outside its territory."). Such an approach also would conflict with the Delaware courts' repeated recognitions that the courts of other states are fully qualified to decide cases involving Delaware law. *See, e.g.*, *Draper v. Paul N. Gardner Defined Plan Trust*, 625 A.2d 859, 868 (Del. 1993) ("We see no reason why the California courts will not, and cannot, apply and interpret Delaware law."); *Teachers' Ret. Sys. of La. v. Scrushy*, 2004 WL 423122, at *10 (Del. Ch. Mar. 2, 2004) ("This court has repeatedly acknowledged that in most circumstances, federal courts and the courts of sister states can apply Delaware law competently."); *Derdiger v. Tallman*, 773 A.2d 1005, 1013 (Del. Ch. 2000) ("Moreover, the California Court is competent to determine all issues of fact and law . . . even those based on Delaware fiduciary duty law.").

[5] *See, e.g.*, *Hughes v. Fetter*, 341 U.S. 609, 613 (1951); *Broderick v. Rosner*, 294 U.S. 629, 647 (1935); *see also Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 518 (1953)

25

the "exclusive jurisdiction" language in the Qualified Dispositions Act would be effective, even if it meant what PNC thinks it means.[6]

This case differs from a situation where parties have agreed voluntarily by contract to an exclusive forum.[7] Beth did not execute the Trust Agreement, nor is there any indication that she chose explicitly or implicitly to become bound by its terms. She does not appear to have participated in or approved the Exstream transfer. The most PNC can allege is that Beth "has been aware of the Exstream Transaction since, at the latest, *sometime in 2011*, if not substantially earlier." PNC Petition ¶ 10 (emphasis added).

---

(characterizing *Hughes* as preventing a state court from laying an "uneven hand on causes of action arising within and without the forum state").

[6] Interestingly, courts outside of Delaware are divided as to whether Delaware can establish an exclusive forum for certain state law claims. Some decisions have declined to interpret the exclusive jurisdiction language in Delaware's statutes as precluding them from hearing a case. *See Anderson v. Children's Corner, Inc.*, 2011 WL 925442 (Conn. Super. Ct. Feb. 15, 2011) (8 *Del. C.* § 220); *Rudebeck v. Paulson*, 612 N.W.2d 450 (Minn. Ct. App. 2000) (indemnification under 8 *Del. C.* § 145(k)); *Sachs v. Adeli*, 804 N.Y.S.2d 731 (App. Div. 2005) (books and records under 6 *Del. C.* § 18-305); *Skipwith v. Fed. Water & Gas Corp.*, 56 N.Y.S.2d 804 (Sup. Ct. 1945) (appraisal under precursor to 8 *Del. C.* § 262); *Stauffacher v. Checota*, 441 N.W.2d 755 (Wis. Ct. App. 1989) (TABLE) (same). Others have embraced the exclusive jurisdiction language as a basis for dismissal. *See Lynch v. Basinger*, 2012 WL 6213781 (D.N.J. Dec. 12, 2012) (8 *Del. C.* § 220); *Yale S. Corp. v. Eclipse Servs., Inc.*, 2010 WL 2854687 (N.D. Okla. July 19, 2010) (same); *Reserve Solutions Inc. v. Vernaglia,* 438 F. Supp. 2d 280 (S.D.N.Y. 2006) (same); *Carbone v. Nxegen Hldgs., Inc.*, 2013 WL 5781103 (Conn. Super. Ct. Oct. 3, 2013) (same; disagreeing with *Anderson*); *Wilson v. Celestial Greetings, Inc.*, 896 S.W.2d 759 (Mo. Ct. App. 1995) (appraisal under 8 *Del. C.* § 262); *Foti v. Western Sizzlin Corp.*, 64 Va. Cir. 64 (2004) (8 *Del. C.* § 220).

[7] *Cf. Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 386 (Del. 2013) (affirming use of anti-suit injunction to enforce exclusive forum provision in contract); *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146-47 (Del. 2010) (same); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 937, 939 (Del. Ch. 2013) (upholding exclusive forum provision in validly adopted bylaw against facial challenge).

Recall that Dan filed for divorce in 2010, that Beth sought her share of any marital assets in the Dynasty Trust, and that she promptly contested the Exstream transfer.

The persuasive force of the purported interference with this court's allegedly exclusive jurisdiction is further blunted by a series of scenarios in which the restrictions imposed by the Qualified Dispositions Act, including the exclusive jurisdiction provision, would not apply to Beth. So far, the parties have identified three reasons why that might be so. First, Nick and Dan—but not PNC—have taken the position that Dan's sale of the original Exstream shares to the Dynasty Trust, over which Dan exercised exclusive investment authority in his capacity as Special Trustee, in return for an unsecured promissory note from the Dynasty Trust with a face amount of $6 million was *not* a qualified disposition, but rather (they claim) an arm's-length, third-party sale. If they are right, then perhaps the Qualified Dispositions Act would not apply.

Second, the Qualified Dispositions Act limits the rights available to creditors of a Trust. Beth has cited Delaware Supreme Court authority holding that a wife seeking maintenance from her husband is not a creditor. *See Garretson v. Garretson*, 306 A.2d 737, 740 (Del. 1973).

> An action brought by a wife seeking separate maintenance from her husband who has deserted her is an attempt on her part to compel the performance of a duty imposed by law upon the husband to support his wife and dependents.
>
> The weight of authority is to the effect that a wife seeking such relief is not a creditor and is not bound by the spendthrift provisions of a trust from reaching the trust assets.

*Id.* If she is right, then perhaps the Qualified Dispositions Act would not apply.

Third, the Qualified Dispositions Act itself states that the limitations imposed by Section 3572 on a creditor's ability to reach trust assets do not extend

> [t]o any person to whom the transferor is indebted on account of an agreement or order of court for the payment of support or alimony in favor of such transferor's spouse, former spouse or children, or for a division or distribution of property incident to a judicial proceeding with respect to a separation or divorce in favor of such transferor's spouse or former spouse, but only to the extent of such debt.

12 *Del. C.* § 3573(1). The language purportedly bestowing exclusive jurisdiction on this court appears as one of the limitations on a creditor's rights under Section 3572. If the Kentucky Family Court issues an order establishing that Dan is indebted to Beth because he owes her support or alimony or pursuant to a division of their property, that order would seem to fall within the plain language of Section 3573(1). By contrast, if the Kentucky Family Court issued an order holding that Dan is indebted to Beth on other grounds, such as her fraudulent conveyance theory, then the same reasoning would not apply, because the statutory carve-out only governs "to the extent of such debt," *i.e.*, a debt based on payment of support or alimony, or a division or distribution of property.

There is no colorable claim based on the Kentucky Family Court's alleged interference with any exclusive jurisdiction of this court. In my view, Delaware has not sought through the Qualified Dispositions Act to arrogate exclusive jurisdiction for itself, nor could it. There are also circumstances where, depending on how the Kentucky Divorce Proceeding plays out, the relief granted by the Kentucky Family Court could co-exist peacefully with the restrictions in the Qualified Dispositions Act.

28

## 2. Interference With Primary Jurisdiction

As an alternative to exclusive jurisdiction, both Nick and PNC argue that this court has primary jurisdiction over the Dynasty Trust. As they perceive it, by touching on matters of trust administration, the Kentucky Family Court's orders interfered with this court's primary jurisdiction. Factually, they are incorrect. At the time the Kentucky Family Court issued its orders, no court had primary jurisdiction over the Dynasty Trust, and the Kentucky Family Court's orders did not interfere with the jurisdiction of any other court. Now that PNC and Nick have filed their petitions, Delaware Supreme Court precedent authorizes this court to address issues of administration relating to the Dynasty Trust, but that assertion of jurisdiction does not automatically mean that the Kentucky Family Court is interfering with this court's jurisdiction. Whether there is a threat of undue interference requires a balancing of the competing judicial interests.

The doctrine of primary jurisdiction rests on the pragmatic reality that, traditionally, courts exercised

> a greater degree of control over the administration of trusts than courts ordinarily exercise in litigation between adverse parties. The creation of the trust involves a continuing relationship between the trustee and the beneficiaries with respect to the trust estate, and a court may be called upon to determine questions which arise in its administration. The beneficiaries may sue to compel the trustee to make an accounting. They may bring an action against him to surcharge him for breaches of trust. They may seek to have the trustee removed and another trustee appointed. In the case of a vacancy in the trusteeship they may apply for the appointment of a successor trustee. The trustee may bring a proceeding for the settlement of his accounts. A proceeding may be brought by the trustee or by the beneficiaries for instructions as to his powers and duties. Application may be made to the court to direct or permit the trustee to deviate from the terms of the trust where unanticipated exigencies have arisen. A proceeding may be brought to determine who are the beneficiaries of the trust and to

29

determine the extent of their interests. A proceeding may be brought asking for an order to terminate the trust. A proceeding may be brought for directions as to the distribution of the trust property on the termination of the trust.

Restatement (Second) § 267 cmt. a (1971). Historically, and still by default in certain circumstances, courts could maintain a supervisory role over a trustee from the trustee's initial qualification,[8] through reviews of the trustee's periodic accountings and requests for compensation,[9] and until the court approved the trustee's withdrawal.[10] Thus, "[o]ne

---

[8] George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, *The Law of Trusts and Trustees* § 151 (2013) ("Generally, where not precluded by statute, the court may fix any reasonable condition precedent to the appointment or qualification of a trustee, or to continue to administer the trust."); *accord* Restatement (Second) § 267 cmt. b ("It is often provided by statute . . . that a testamentary trustee must qualify as trustee in the court which has jurisdiction over the administration of the testator's estate."); *see also* Restatement (Third) of Trusts § 34 cmt. a, reporter's note (2003) ("Several decades ago it was stated that '[e]leven states appear to require testamentary trustees to qualify and account in much the same manner as executors, though quite different requirements relate to trustees of inter vivos trusts in these same states.'" (quoting Unif. Probate Code cmt. to art. VII (as of 1969))). *But see* Restatement (Second) § 267 reporter's note ("At common law a trustee was not required to qualify as trustee in court, whether the trust was created inter vivos or by will."). By default, Delaware actively supervises certain types of trustees. *See, e.g.*, Ct. Ch. R. 110(a) (requiring trustees appointed by the court to "file a verified inventory" of trust assets); Ct. Ch. R. 110(b) (requiring "each trustee named in a will [to] file a verified inventory of all assets received," unless otherwise provided in the will); *see also* Ct. Ch. R. 109(a) (noting that the Court of Chancery may require, "in the order appointing a . . . trustee, each . . . trustee and each trustee named in a will" to post a bond "before acting as . . . trustee or being qualified to act as such"); *cf.* 12 *Del. C.* § 3561(a) (defining "qualified trustee" to mean "any person authorized by the law of this State or of the United States to act as a trustee whose activities are subject to supervision by the Bank Commissioner of the State, the Federal Deposit Insurance Corporation or the Comptroller of the Currency of the United States").

[9] *See, e.g.*, *Law v. Law*, 753 A.2d 443, 449-50 (Del. 2000) (affirming finding that the trustees had breached the trust because they failed to provide statutory accountings, in violation of Court of Chancery Rule 114, which required that the "[t]rustees submit bi-annual accountings of their administration of a trust created by a will to the Court of Chancery, showing all receipts, disbursements and investments made on behalf of the trust"); *accord* Ct. Ch. R. 114 ("Each . . . trustee appointed by the Court and each trustee named in a will probated after April 5, 1909,

indication that a particular court has primary supervision over the administration of a trust is if 'the trustee is required to render regular accountings in the court in which he has qualified.'" *In re Peierls Family Testamentary Trusts (Peierls Testamentary)*, 77 A.3d 223, 228 (Del. 2013) (quoting Restatement (Second) § 267 cmt. e). When a particular court could be expected to establish a continuing relationship with a trust, it was logical that once a trustee qualified in a particular court, that court would exercise

---

unless such testamentary trustee be relieved from accounting by express provision of the will, shall file with the Register in Chancery . . . and shall submit to the Court for approval, just and true accounts showing all receipts and disbursements with respect to the assets."); Ct. Ch. R. 117 (requiring that "[e]very account of a . . . trustee shall include a schedule" with certain information); Ct. Ch. R. 120 (providing that the Register in Chancery will review "each account filed with the Court"); Ct. Ch. R. 122 (providing when an account will be presented to the court for approval); *cf. Trs. of New Castle Common v. Gordy*, 93 A.2d 509, 518 (Del. 1952) (referring to "the constitutional powers of the Court of Chancery to call the trustees to account for their administration of the trust property"). The Court of Chancery regulates the compensation of certain trustees, defined by rule as "testamentary trustees, trustees for mentally ill persons, trustees by appointment of the Court, and other trustees, guardians and fiduciaries whose duties call for the care and management of property," unless otherwise provided in a "valid agreement determining compensation." Ct. Ch. R. 132(a)-(e) (providing commission tables). Outside of Delaware, a leading treatise notes that "[i]n many states, trustees, at least those acting under a will, must account in court prior to discharge." 3 Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, *Scott & Ascher on Trusts* § 17.4, at 1191 (5th ed. 2007). "In some states, trustees must account in court periodically." *Id.* § 17.4, at 1191 & n.11 (citing *Estate of Smith v. Underwood*, 487 S.E.2d 807 (N.C. Ct. App.), *review denied*, 494 S.E.2d 410 (N.C. 1997), a North Carolina decision that affirmed a trial court's entry of directed verdict against trustee who failed to file annual accountings). "Refusal to account is grounds for removal." *Id.* § 17.4, at 1191 & n.12 (citing *Walker v. Cox*, 531 So. 2d 801 (Miss. 1988)).

[10] 3 Scott, *supra*, § 17.2, at 1077 ("Generally, a trustee can resign only with the court's permission, unless all the beneficiaries are adult and competent and give their consent, or unless the terms of the trust provide otherwise."); *cf. In re Catell's Estate*, 38 A.2d 466, 469 (Del. Ch. 1944) ("The power of this court to remove a trustee, appointed by a deed or will, is merely ancillary to its duty to see that the trust is administered properly . . . ." (citing 1 Austin Wakeman Scott, *Scott on Trusts* § 107.1 (1st ed. 1939))).

31

primary supervision in the form of "continuing jurisdiction over the administration of the trust."[11]

The degree of supervision that courts exercise over trusts has declined over time.[12] The creators of the Dynasty Trust wanted to be on the leading edge of that trend, and they crafted the provisions of the Trust Agreement so that no court would exercise meaningful supervision over the Dynasty Trust. Section 4.2, entitled "Powers of Trustee Exercised Without Court Authorization," provides that "[t]he powers granted to the Trustee under this Agreement may be exercised in whole or in part, from time to time, without court authorization." TA § 4.2. Other provisions reiterate and reinforce this general statement by exempting particular acts from court supervision. For example, "[n]o Trustee shall be required to file or render periodic accounts in or to any court other than for good cause

---

[11] Restatement (Second) § 267 cmt. d. Relatively speaking, testamentary trusts were (and still are) regulated more closely than *inter vivos* trusts. Bogert, *supra*, § 292 ("In the case of a trust created by will there may be a statute of the state of the testator's domicile by which the court having jurisdiction over administration of the testator's probate estate retains supervisory jurisdiction over matters relating to administration of the trust, such as settling the accounts of the trustee or the appointment of a successor trustee. . . . The details of these statutory requirements vary but in most cases require that the trustee remain subject to the court's supervisory jurisdiction in such matters as approval of trust accounts and the appointment of successor trustees.").

[12] *See, e.g.*, Bogert, *supra*, § 563 (explaining that while previously "[i]n some states, by virtue of court practice or statute, it was possible for a trustee to petition the court of equity of a particular county to assume supervision of the trust and, if the court granted the request, jurisdiction over the trust was fixed and the trustee was required to secure court approval of various acts of administration and occupied a position somewhat similar to that of a receiver," under current law, "[t]rustees become or remain subject to the continuing supervision of a court for one or more reasons," for example by receiving his appointment from the court); *see also* Unif. Probate Code § 7-201(b) (amended 2010) ("Neither registration of a trust nor a proceeding under this section result in continuing supervisory proceedings.").

shown." *Id.* § 5.6. Annual accountings are delivered to Dan or to the Trust Protector, and the Trust Agreement provides that

> [a]ny such accounting . . . shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an accounting is rendered, and the Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction . . . .

*Id.* The Trustee is also entitled to have its compensation paid "at any time without court approval." *Id.* § 5.8. And the Trustee may resign at any time and for any reason "without leave of court." *Id.* § 5.3. The Trust Agreement similarly exempts from judicial supervision the exercise of certain powers held by other parties with roles in the administration of the Dynasty Trust. For example, Section 8.5 states that any appointments made under that article, which governs the Special Trustee, "shall be made without leave of any court." *Id.* § 8.5.

Nor is the Dynasty Trust so tightly tied to Delaware as to suggest the existence of dormant primary jurisdiction in this court before PNC and Nick filed their petitions. Although the Dynasty Trust currently has its situs in Delaware and currently is governed by Delaware law, both are fragile features that those controlling the Dynasty Trust can readily change. As for situs, Section 10.2 of the Trust Agreement states:

> The original situs of the trusts created hereunder shall be Delaware. The situs of any trust created hereunder may be maintained in any jurisdiction (including outside the United States), as the Trust Protector, in the exercise of his or her sole and absolute discretion, may determine, and may thereafter be changed at any time or times to any jurisdiction selected by the Trust Protector. . . . Upon any such change of situs, the trust estate may thereafter, at the election of the Trust Protector and with the consent of the Trustee of said trust, be administered exclusively under the laws of (and

33

subject, as required, to the exclusive supervision of the courts of) the jurisdiction to which it has been transferred.

*Id.* § 10.2. Consistent with the theme of avoiding judicial supervision, Section 10.2 provides that if the situs is changed, "the Trustee of said trust is hereby relieved of any requirement of having to qualify in any other jurisdiction and of any requirement of having to account in any court of such other jurisdiction." *Id.*

The same is true for the choice of Delaware law. The Trust Agreement selects Delaware law to govern "[t]he validity, construction and effect of the provisions" of the Trust Agreement and the administration of the Dynasty Trust. *Id.* § 10.1. But the Trust Agreement does *not* state affirmatively that Delaware law will continue to govern even if a non-Delaware trustee is appointed or the situs of the Dynasty Trust is moved to a different jurisdiction. Consequently, under recent Delaware Supreme Court precedent, the selection of Delaware law to govern the Dynasty Trust is an impermanent and potentially temporary detail that will change if those in control of the Dynasty Trust cause either of those events to come to pass. *See In re Peierls Family Inter Vivos Trusts (Peierls Inter Vivos)*, 77 A.3d 249, 263-66 (Del. 2013).

Dan also can opt for new controlling law and a new jurisdiction for all or any portion of the trust estate by exercising his *inter vivos* or testamentary powers of appointment over the trust corpus. The Trust Agreement states that whenever Dan chooses to exercise his special powers by appointing trust assets to a new trust, he is authorized "to select a new situs for any such trust and to provide that the law of that new situs shall thereafter govern the validity, construction, and administration of such trust."

34

TA § 1.1.8 (*inter vivos* power); *accord id.* § 1.1.9 (testamentary power). During Dan's lifetime, any Holder can accomplish the same thing using its special power of appointment. *Id.* § 6.2. After Dan's death, whoever was the "wife of the Grantor's son" at the time of his death gains special powers of appointment equivalent to those Dan exercised during his life. *Id.* § 1.1.10(g). If the trust corpus devolves into individual trusts for the benefit of Dan's descendants, the trust beneficiaries receive the same powers over their trusts. *Id.* § 1.1.10(i)(8).

Having the Dynasty Trust governed by Delaware law and its affairs adjudicated by a Delaware court is merely an option within the discretion of those who control the Dynasty Trust, not any type of commitment to oversight by the State of Delaware or its courts. The drafters of the Trust Agreement demonstrated their awareness of this fact by consistently referring not to this court by name, or to the Delaware courts, but rather to "the court *then* having primary jurisdiction over the trust." *Id.* § 4.3 (emphasis added); *accord id.* § 4.4; *see also id.* § 5.2 (authorizing a petition for a successor Trustee to be filed in "a court of competent jurisdiction"); *id.* § 5.6 (authorizing applications to "a court of competent jurisdiction").

There is, of course, nothing wrong with Glenn, Dan, and the drafters of the Trust Agreement choosing to proceed in this fashion—at least until they seek to impose their choices unilaterally on others who never consented to the degree of contractual liberality that the Trust Agreement exhibits. What matters for present purposes is that the terms of the Dynasty Trust and their implementation have been fundamentally inconsistent with Nick and PNC's contention that this court had primary jurisdiction over the Dynasty

35

Trust when the Kentucky Family Court issued the Kentucky Status Quo Orders. No court did. *See Peierls Inter Vivos*, 77 A.3d at 270 ("Because an *inter vivos* trust's trustee is able to perform its duties without court supervision, no particular court acquires 'jurisdiction over the administration of the trust until a suit is brought in a court by the beneficiaries or by the trustee.'" (quoting Restatement (Second) § 272 cmt. e)).

Now that Nick and PNC have filed their petitions and placed at issue disputes about the administration of the Dynasty Trust, Delaware Supreme Court precedent authorizes this court to assert primary jurisdiction over the administrative issues they have raised. *See Peierls Testamentary*, 77 A.3d at 228. This court's exercise of jurisdiction is permissive, not mandatory.[13] Nor is it exclusive: Other courts may still exercise jurisdiction over matters of trust administration so long as doing so would not

---

[13] *See Peierls Inter Vivos*, 77 A.3d at 269 (affirming decision to decline jurisdiction); *Peierls Testamentary*, 77 A.3d at 228, 230, 232 (same). If a trustee has not qualified in another jurisdiction, then "the court of the place of administration 'may exercise primary supervision'" over the trust. *Peierls Testamentary*, 77 A.3d at 228 (quoting Restatement (Second) § 267 cmt. e ("If a court has jurisdiction, the question arises whether it will or will not exercise jurisdiction.")); *see also* Bogert, *supra*, § 292 ("There may be the further question of whether the court having jurisdiction will choose to exercise its discretionary power to act in the matter.").

Nick stresses the Delaware Supreme Court's further statement that "[a] court having primary supervisory power '[has] and will exercise jurisdiction as to all questions which may arise in the administration of a trust.'" *Peierls Testamentary*, 77 A.3d at 228 (quoting Restatement (Second) § 267 cmt. e). A broader exercise of jurisdiction makes sense when a court has established an actual supervisory relationship with a trust over a period of time. That is not the case here, and I do not believe that the Delaware Supreme Court intended through its statement in the *Peierls Testamentary* case to instruct this court to issue anti-suit injunctions regularly whenever a trust administration matter in this court and a case in another court involved potentially overlapping issues. I cannot, of course, speak for the Delaware Supreme Court, and inherent in the role of a trial judge is the recognition that I may be wrong about what the Delaware Supreme Court intended.

36

constitute "undue interference" with supervision in the primary jurisdiction. *Peierls Testamentary*, 77 A.3d at 228 (quoting Restatement (Second) § 267 cmt. e). Other courts also "may exercise jurisdiction in proper cases if they have jurisdiction over the trustee, or if they have jurisdiction over trust assets insofar as interests in those assets are concerned." *Id.* at 227 (citing Restatement (Second) § 267 cmt. d).

The discretionary exercise of jurisdiction requires a balancing of competing jurisdictional interests. Multistate trusts like the Dynasty Trust raise complex issues of jurisdiction and choice of law. Bogert, *supra*, § 291. "In determining whether it has jurisdiction to entertain the proceedings and what local law should be applied in resolving the issues, the forum court in which the proceedings are brought must consider the nature and extent of the various contacts which the several states have with the trust." *Id.* "Resolution of the underlying substantive issue before the court should not depend upon 'forum shopping' by a plaintiff seeking the most favorable result under the local law of a particular state." *Id.*

Because of the need for balancing, it is possible that a jurisdictional conflict could arise as the Kentucky Divorce Proceeding and this case move forward. Given that this court has not previously exercised supervisory jurisdiction over the Dynasty Trust, the terms of the Trust Agreement that minimize the opportunities for judicial supervision, the potentially ephemeral connection between the Dynasty Trust and Delaware, and the lack of any supervisory jurisdiction in this court when the Kentucky Family Court issued its orders, the claim of interference is faintly tinged at best. But it is colorable, which warrants this court considering whether Nick will suffer irreparable harm, then evaluating

37

the balance of hardships. The consideration of competing jurisdictional interests will be addressed as part of the balancing process.

## B.    Irreparable Harm

The second and more important requirement for the issuance of a TRO is a showing of irreparable harm. According to his papers, Nick will suffer irreparable harm absent a TRO because

> (a) the Kentucky Family Court is attempting to coerce the Special Trustee to abandon his entitlement to have this Court hear all claims related to the administration of the Trust; (b) the Kentucky Family Court is attempting to coerce the Special Trustee to breach his fiduciary duties; (c) the Special Trustee has been denied due process in that a court that lacks jurisdiction over the Trust and its trustees is purporting to direct the administration of the Trust; (d) the Special Trustee's constitutional right to travel has been improperly curtailed; and (e) the Special Trustee faces imminent and unquantifiable reputational harm.

Motion ¶ 7. None of these concerns threaten Nick with irreparable harm because he has an adequate remedy at law in the Kentucky courts. *See Nat'l Indus.*, 67 A.3d at 383 ("To find that [a party] would suffer irreparable harm absent an . . . injunction, this Court ha[s] to conclude that [it] lack[s] an adequate remedy at law.").

Initially, Nick has an adequate remedy at law in that he can appear before the Kentucky Family Court in response to the Rule to Show Cause, present his case with the assistance of counsel, and receive a decision from the Kentucky Family Court based on the merits of his particular arguments and situation. The portions of the record in the Kentucky Divorce Proceeding that the parties have submitted show that the Kentucky Family Court has made itself available to the parties and has given careful consideration to their arguments.

Nick has demonstrated to this court that he has the ability to advance his positions forcefully. For example, Nick has represented to this court that he is "a Georgia resident over whom the Kentucky Family Court lacks personal jurisdiction and who has not been served with process in any Kentucky Family Court proceeding." Motion ¶ 6. Nick contends that he is not subject to personal jurisdiction in Kentucky, thereby rendering the Rule to Show Cause and any contempt order a legal nullity. There is Kentucky authority supporting the proposition that a person cannot be found in contempt of an order unless the court has personal jurisdiction over him. *See Lyons v. Bryan*, 273 S.W.2d 838, 839 (Ky. 1954). The question in *Lyons* was "whether the circuit court has power to punish for contempt a person upon whom personal service has not been obtained and who has not voluntarily subjected himself to the jurisdiction of the court." *Id.* The Kentucky Court of Appeals, then the state's highest court, answered that question in the negative, holding that it was "essential that the court have acquired personal jurisdiction of the offender, before punishment for contempt may be imposed." *Id.* The Kentucky Court of Appeals reached this holding even though the allegedly violated order "was directed against [the alleged contemnors] and they had actual knowledge of its provisions." *Id.* By citing *Lyons*, this decision does not mean to suggest how the Kentucky Family Court should rule, only to note that Nick has non-frivolous arguments to advance. Because of his non-frivolous arguments, it is hardly guaranteed that he will be held in contempt.

If Nick fails to convince the Kentucky Family Court, as he fears, then Nick has an adequate remedy at law in the form of judicial review by the Kentucky Court of Appeals and, ultimately, the Kentucky Supreme Court. Although the Kentucky Supreme Court

39

has called into doubt the ability of an alleged contemnor to obtain a writ of prohibition based on a claimed lack of personal jurisdiction, it has emphasized that it "continue[s] to endorse the principles of due process implicit in . . . *Lyons*" and that appellate review would be available. *Goldstein v. Feeley*, 299 S.W.3d 549, 553 (Ky. 2009). Dan successfully obtained prompt appellate review after the Kentucky Family Court held him in contempt.

Given the availability of a hearing and due process before the Kentucky Family Court and the additional protection of review by the Kentucky appellate courts, Nick has an adequate remedy at law. He therefore has not established the threat of irreparable harm requisite for a TRO.

Although this decision could deny the TRO on that basis alone, Nick's arguments about threatened jurisdictional conflict add another dimension to the irreparable harm inquiry. Nick cites the Delaware Supreme Court's order in *Williams Natural Gas Co. v. BHP Petroleum Co.*, 1990 WL 38329 (Del. Mar. 12, 1990) (ORDER), as holding that a threat of irreparable harm exists when competing actions put sister courts on a "collision course." *Id.* at *2. There are obvious distinctions between this case and *Williams*, including that the competing actions in *Williams* were mirror-image cases between two parties to a contract and the Delaware case was indisputably first-filed. Nevertheless, *Williams* can be read to stand for the proposition that a jurisdictional conflict that rises to the level of a "collision course" gives rise to a threat of irreparable harm. *Id.*

As with Nick's claim of interference with this court's jurisdiction, whether this court and the Kentucky Family Court are on a collision course depends on their

40

competing jurisdictional interests. This decision will consider those interests as part of the balancing of hardships.

## C.     The Balancing Of Hardships

The final factor in the TRO test involves the balancing of hardships. *CBOT Hldgs.,* 2007 WL 2296356, at *3. Because Nick has not established any threat of irreparable harm to himself, the balancing of hardships turns solely on the threatened jurisdictional conflict, which in this case has both a near-term and a long-term component. After examining both, this decision concludes that neither warrants relief. A TRO addressing the near-term issues potentially raised by the Rule to Show Cause is unnecessary. Similarly, this court need not attempt preemptively to stake a claim to jurisdictional territory on the long-term issues, but rather can await the conclusion of the Kentucky Divorce Proceeding.

### 1.     The Potential Near-Term Conflict

The potential near-term conflict is created by the Rule to Show Cause. The Kentucky Family Court has an obvious and indisputable interest in moving forward with the Kentucky Divorce Proceeding and rendering a decision on the merits. To do so, the Kentucky Family Court must ensure that the assets it will rule on are not dissipated before it renders a decision. The Kentucky Family Court has an equally obvious interest in enforcing its orders and controlling the proceedings before it. Balanced against these interests are the following issues of trust administration that Nick fears could be the subject of rulings by the Kentucky Family Court on the Rule to Show Cause: (i) whether Dan validly resigned as Special Trustee, (ii) whether Nick was validly appointed as

41

Special Trustee, (iii) whether Nick can be compelled to resign as Special Trustee and reappoint Dan, and (iv) who has the power to direct PNC. Delaware has an interest in its law being applied correctly. It is not clear to me what other interest Delaware has in this matter. Certainly Delaware does not have an interest in interfering in the conduct of judicial proceedings in a sister state.

Although a near-term balancing of these competing interests would favor the denial of a TRO, there does not appear to be an actual conflict between (i) the Kentucky Family Court's interest in moving forward with the Kentucky Divorce Proceeding and (ii) Delaware's interest in having matters of trust administration decided by this court so that the Delaware Supreme Court can determine authoritatively whether Delaware law has been applied correctly. At this point, it is not at all clear to me that the Kentucky Family Court will reach any of the trust administration issues of Delaware law when addressing the Rule to Show Cause. Nick could convince the Kentucky Family Court that he is not in contempt. Even if Nick is unsuccessful and the Kentucky Family Court finds him in contempt, the Kentucky Family Court could issue a sanction other than requiring Nick to resign as Special Trustee and reappoint Dan.

From my limited review of the portions of the record in the Kentucky Divorce Proceeding that that parties have provided, it appears that the Kentucky Family Court's primary concern has been and remains ensuring that potential marital assets are not dissipated before it can rule on the merits and allocate ownership. Dan was a human being who was subject to the Kentucky Family Court's jurisdiction, so the Kentucky Family Court could maintain the status quo through Dan. When Dan resigned, the

42

Kentucky Family Court arguably lost its hold on the entities that Dan controlled, like the Dynasty Trust. Faced with fights over whether Nick, PNC, and the Dynasty Trust were subject to its jurisdiction, the Kentucky Family Court naturally wanted Dan back in charge of the Dynasty Trust's affairs.

Because the parties agree that this court can exercise jurisdiction over Nick, PNC, and the Dynasty Trust, this court's involvement can assist the Kentucky Family Court in achieving its goal without creating a jurisdictional conflict. Contemporaneous with the issuance of this decision, this court has entered a status quo order that restricts the Dynasty Trust to activities in the ordinary course of business. The parties had agreed upon the utility of such an order, but required the court's assistance to hash out its exact terms. The existence of the status quo order may lessen the degree to which the Kentucky Family Court believes that Dan must be placed back in charge as Special Trustee, thereby mitigating the need for the Kentucky Family Court to reach matters of trust administration.

At this point, therefore, I do not believe that the Kentucky Family Court and this court are on a near-term collision course. Moreover, Nick concedes that any TRO this court might issue could not bind the Kentucky Family Court itself, which issued the Rule to Show Cause *sua sponte*. Other than potentially suggesting disrespect towards the Kentucky Family Court, the principal effect of a TRO would be to deprive the Kentucky Family Court of briefing from the parties who were restrained. For this judge, having briefing from all parties is helpful, and I assume that is true for the Kentucky Family Court as well. To my mind, the competing jurisdictional interests do not warrant issuing

43

a TRO that might achieve at most the dubious goal of depriving the Kentucky Family Court of Beth's input on the Rule to Show Cause.

There is a Delaware precedent which, while not precisely analogous, supports the denial of Nick's TRO application. *See In re the Trusts U/A/D December 30, 1996 & the Trusts U/A/D January 13, 2006 Created By Michael J. Farrell (Farrell Trusts)*, 2008 WL 5459270 (Del. Ch. Dec. 18, 2008). In *Farrell Trusts*, the trustee of six Delaware trusts petitioned for instructions as to whether the trustee had to obey the orders of the Family Division of the Pennsylvania Court of Common Pleas of Allegheny County (the "Pennsylvania Family Court"). The husband had placed millions of dollars of assets into the trusts during the course of his marriage. In the underlying divorce proceeding, the Pennsylvania Family Court held that the wife was entitled to 40% of the marital estate. After ordering discovery into the value of the trusts and all transfers to and distributions from them, the Pennsylvania Family Court voided the transfers to the trusts and directed that their assets be placed in an escrow account. The trustee then sought a preliminary injunction from this court that would bar the trusts from complying with the Pennsylvania Family Court's orders. The wife subsequently initiated contempt proceedings against the trustee in the Pennsylvania Family Court. *Id.* at *2-3.

Vice Chancellor Parsons denied the injunction, finding that the trustee had not established a sufficient threat of irreparable harm. The trustee claimed that the orders of the Pennsylvania Family Court would drain the trusts' assets at the expense of nonparty beneficiaries, but this court found "no reason to doubt the Pennsylvania court's ability to address those concerns." *Id.* at *7. The trustee also claimed that its due process rights

44

were violated because it was not subject to jurisdiction in the Pennsylvania Family Court. This court observed that the question of personal jurisdiction had been litigated in the Pennsylvania Family Court and decided against the trustee. "[T]o the extent Petitioner disagrees with a ruling or order, it may seek redress on appeal or otherwise as provided in the Pennsylvania laws and rules of civil procedure." *Id.* This court similarly held that if the trustee disagreed with any aspect of the remedy the Pennsylvania Family Court imposed, the trustee or any beneficiary could "pursue their rights" in Pennsylvania. *Id.* In balancing the equities, Vice Chancellor Parsons also cited comity as counseling against an injunction:

> What Petitioner requests is an order from this Court that would allow it to ignore a contrary order from another court. In determining whether to grant such extraordinary relief, I must be mindful of the interests of comity and the efficient administration of justice. Those interests are especially important here because many of the relevant actions occurred during the pendency of the Pennsylvania litigation.

*Id.* at *8 (footnote omitted). As in *Farrell Trusts*, the potential near-term conflict with the Kentucky Family Court does not warrant the issuance of a TRO.

### 2. The Potential Longer-Term Conflict

The potential longer-term conflict that Nick and PNC fear does not warrant relief either. On this issue, Nick asks this court to draw a jurisdictional line in the sand by forbidding the parties to the Kentucky Divorce Proceeding from litigating particular issues before the Kentucky Family Court. On balance, that seems unnecessary.

The long-term interests of the two courts are the same as their short-term interests. The Kentucky Family Court needs to resolve the Kentucky Divorce Proceeding. This

45

court has an interest in having matters of trust administration that are governed by Delaware law decided here so that the Delaware Supreme Court can ensure they are decided correctly. Just as this court has no interest in interfering in the conduct of judicial proceedings before a court of a different state, this court also has no interest in having Delaware law deployed to defeat the marital property laws of another state.

Once again, although balancing these competing interests over the longer term would favor the Kentucky Family Court, it seems unlikely that the two judicial systems are actually on a collision course. This court is prepared to determine the validity of Dan's resignation and Nick's appointment as Special Trustee, but having this court resolve those issues as matters of Delaware law should help, rather than hinder, the Kentucky Family Court and the parties to the Kentucky Divorce Proceeding. Rulings on these issues will make clear who has control over the Dynasty Trust. To the extent it becomes necessary for the Dynasty Trust to comply with an order from the Kentucky Family Court or respond to the parties in the Kentucky Divorce Proceeding, there will be an authoritative determination identifying who should respond on behalf of the Dynasty Trust. Whether Dan's resignation and Nick's appointment are valid as matters of Delaware trust law does not resolve the separate question of whether those actions violated the Kentucky Status Quo Orders, so this court's determinations will not interfere with the Kentucky Family Court's ability to enforce its orders or manage the Kentucky Divorce Proceeding.

The question of whether an eventual judgment issued by the Kentucky Family Court can be enforced against the trust estate is not a matter where this court needs to act

now to carve out and defend a future jurisdictional role. The Kentucky Divorce Proceeding should be completed first. If that case results in a final, non-appealable judgment against the Dynasty Trust, and if the judgment holder seeks to enforce it, then (but only then) will there be important questions of Delaware law to be decided.

The journey to a judgment-enforcement proceeding involves many intermediate steps that do not raise questions of Delaware law and should be completed first, because they will inform any decision this court might eventually be called upon to make. Most notably, a dispute presently exists over whether Dan held the property rights under Kentucky law that would form a prerequisite to his ability to transfer the Exstream shares to the Dynasty Trust. Beth maintains that the property Dan transferred constituted marital property in which she held an interest such that Dan could not unilaterally transfer it to the Dynasty Trust without her consent. If there is no dispute about the grantor's title to the property placed in trust, then the question of what jurisdiction's law applies to the transfer remains contestable, but a stronger argument can be made that the law governing the trust should determine the validity of the transfer and whether a creditor or other person can reach the property after it has been placed in the trust.[14] By contrast, if there is a question about whether the grantor possessed the requisite property rights in the first

---

[14] *See* Restatement (Second) § 273 ("Whether the interest of a beneficiary of a trust of movables is assignable by him and can be reached by his creditors is determined . . . (b) in the case of an inter vivos trust, by the local law of the state, if any, in which the settlor has manifested an intention that the trust is to be administered . . . .").

47

place, the scope of the grantor's property rights must be determined by the law governing those property rights, not the law selected to govern the trust.[15]

To illustrate this proposition using an extreme and unrealistic hypothetical, assume that rather than contributing to the Dynasty Trust the Exstream shares over which Beth has a contestable claim, Dan instead surreptitiously removed a work of fine art from the wall of a neighbor's house in Lexington, Kentucky, sent the painting to Delaware, and told PNC to hold it as part of the corpus of the Dynasty Trust. It would seem self-evident that under those circumstances, the neighbor could maintain an action against Dan in Kentucky to establish that the neighbor owned the artwork under Kentucky law, that Dan had no power to transfer the artwork to the Dynasty Trust as a matter of Kentucky law, and that the neighbor was entitled as a matter of Kentucky law to a remedy against Dan. Because Dan's property rights in the artwork would be a necessary predicate to the validity of his transfer of the artwork to the trust, Kentucky law would govern the question of his property rights. The fact that Dan chose Delaware law in the Trust

---

[15] *See, e.g.*, *Riechers v. Riechers*, 679 N.Y.S.2d 233, 236 (N.Y. Sup. Ct. 1998) (determining that $4 million which husband placed in Cook Islands trust during marriage was marital property as a matter of New York law and awarding to wife one-half of the value of those material assets); *cf.* Restatement (Second) § 269 cmt. c ("The law that would be applied by the courts of the state of the testator's domicil at death determines whether and to what extent a testator may by will prevent his surviving spouse from receiving the share of his movables which she would receive if he had died intestate."); Restatement (Second) § 270 cmt. b ("[W]here the settlor creates a revocable trust in a state other than that of his domicil, in order to avoid the application of the local law of his domicil giving his surviving spouse a forced share of his estate, it may be held that the local law of his domicil is applicable, even though he has designated as controlling the local law of the state in which the trust is created and administered.").

Agreement to govern (at least initially) the administration, construction, validity, and effectiveness of the Dynasty Trust would not cause Delaware law to trump whatever law controlled the question of Dan's property rights vis-à-vis his neighbor. Nor could an exclusive forum provision in the Trust Agreement selecting the Court of Chancery force the neighbor to litigate the property rights issue in this court.

Chief Justice Strine dealt with competing jurisdictional priorities of a similar sort while serving as Chancellor. *See Matijkiw v. Strauss*, C.A. No. 6102-CS (Del. Ch. Sept. 19, 2011). The plaintiffs in *Matijkiw* were individuals who claimed to have been defrauded by the defendants in various business dealings, and they initially sued the defendants in the Superior Court of the District of Columbia. Discovery revealed that the defendants had created and funded two irrevocable Delaware trusts. When the plaintiffs added the trusts to the District of Columbia proceeding, the trusts sought to invoke the protections of the Qualified Dispositions Act and claimed they could not be sued except in the Court of Chancery. The plaintiffs then filed suit against the defendants and the trusts in this court. The trustees of the trusts also filed suit in this court. They claimed to have resigned as trustees, sought to have the Court of Chancery declare the validity of their resignations, and requested leave to deposit the corpus of the trusts with the Register in Chancery and exit from the scene. The two Delaware actions were consolidated.

After some initial skirmishing between the parties, the trustees dropped their requests for relief, leaving only the question of whether the Delaware action should proceed against the trusts. Chief Justice Strine approved the dismissal of the Delaware action without prejudice in deference to the District of Columbia action, holding that this

49

approach provided a rational answer to the competing concerns that would "conserve the parties' resources and the resources of two court systems." *Id.* at 1. The Chief Justice noted that if necessary, after the District of Columbia action resulted in a final judgment that was no longer subject to appeal, the plaintiffs in the District of Columbia action could renew their Delaware lawsuit against the trusts. *Id.* at 2. A search of the docket indicates that the Matijkiws did not have to return to Delaware.

*Matijkiw* counsels in favor of permitting the Kentucky Divorce Proceeding to play out first and against this court prematurely marking off jurisdictional territory. The potential Delaware law issues regarding the enforcement of a judgment against the Dynasty Trust may never arise. If they do, they can and should be addressed after the Kentucky Divorce Proceeding has reached a final judgment that is no longer subject to appeal. This court does not need to try to "call forum" at this point just because the parties can glimpse those future issues in the distance. *Cf. In re Topps Co. S'holders Litig.*, 924 A.2d 951, 956 (Del. Ch. 2007) (discussing the problems that can arise from premature efforts to "call forum").

### III. CONCLUSION

The TRO application is denied. If Nick disagrees with the Rule to Show Cause or opposes Beth's requests for relief from the Kentucky Family Court, he should make his arguments to the Kentucky Family Court. If the Kentucky Family Court rejects his arguments and he believes that the Kentucky Family Court has erred, then Nick should seek a remedy from the Kentucky Court of Appeals and, ultimately, from the Kentucky Supreme Court. Unless and until the Delaware Supreme Court instructs otherwise, this

court's role does not include acting as a quasi-appellate court for interlocutory review of divorce proceedings in other jurisdictions.