# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JOHN R. TOEDTMAN,  )
 )
   Plaintiff,  )
 )
v.  ) C.A. No. N17C-08-210 RRC
 )
TURNPOINT MEDICAL DEVICES,  )
INC.,  )
 )
   Defendant.  )
 )

Submitted: October 30, 2018
Decided: January 23, 2019

On Plaintiff John R. Toedtman's Cross-Motion for Summary Judgment.
**GRANTED IN PART**.

On Defendant TurnPoint Medical Devices, Inc.'s Cross-Motion for Summary
Judgment. **DENIED.**

## MEMORANDUM OPINION

Theodore A. Kittila, Esquire, and James G. McMillan, III, Esquire, Halloran Farkas
+ Kittila, LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Sharon Oras Morgan, Esquire, and Courtney A. Emerson, Esquire, Fox Rothschild
LLP, Wilmington, Delaware, Attorneys for Defendant.

COOCH, R.J.

## I. INTRODUCTION

Plaintiff John R. Toedtman ("Plaintiff") and Defendant TurnPoint Medical
Devices, Inc. ("TurnPoint/Defendant") have filed cross-motions for summary
judgment in the above captioned matter. Plaintiff asserts that he has a valid
employment agreement with TurnPoint which TurnPoint allegedly breached when

1

it failed to pay severance and other benefits totaling $250,900 after Plaintiff's termination without cause. Contrarily, TurnPoint contends the employment agreement was voidable under 8 *Del. C.* § 144(a), was properly voided, and that Plaintiff is not entitled to recovery.

The Court concludes, in the context of this case where both parties have filed cross-motions for summary judgment, that Plaintiff's employment agreement is valid, that TurnPoint breached the employment agreement, and that Plaintiff is entitled to recover severance and other fees totaling $250,900 owed to him under the employment agreement. Furthermore, Plaintiff has established that he is entitled to recovery under the doctrine of promissory estoppel. However, Plaintiff has not demonstrated that he is entitled to recover attorneys' fees and costs based on alleged bad faith. Further, the Court lacks jurisdiction to determine Plaintiff's claim for indemnification under the company's bylaws. Therefore, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART.** Defendant's Motion for Summary Judgment is **DENIED.**

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Since the parties each filed cross-motions for summary judgment as to all disputed claims, the Court asked the parties to submit a joint stipulation of the procedural history and the factual background to aid the Court in rendering its decision. The stipulation was submitted to the Court on October 30, 2018. The stipulated procedural history and facts are set forth below. It is somewhat lengthy, and the Court has later restated only those facts necessary to this decision.

1. On August 14, 2017, Toedtman filed the above-captioned civil action against the Company. The Complaint alleged four counts: (1) Breach of Contract; (2) Promissory Estoppel; (3) Quasi-Contract/*Quantum Meruit*; and (4) Unjust Enrichment.

2. On September 28, 2017, the Company filed a Motion for Summary Judgment. This motion was withdrawn without prejudice following a scheduling conference before Judge Cooch on October 23, 2017. The Court set a trial date of September 24 and 25, 2018.

3. The Company filed its Answer and Affirmative Defenses on November 14, 2017.

4. Thereafter, the Parties engaged in discovery. Documents were produced by both sides and depositions were taken of various persons. Experts were designated by both Parties and expert reports were exchanged.

2

5.  On June 8, 2018, following the completion of discovery, both Parties filed Motions for Summary Judgment (the "Cross-Motions"). Both motions were fully briefed by August 8, 2018. Additionally, both Parties filed Motions *in Limine* seeking to exclude the testimony and expert reports of the experts. Both motions were fully briefed by the Parties.

6.  On August 17, 2018, the Court heard oral argument on the Cross- Motions. The Court determined that the Cross-Motions would be treated as a stipulation for decision on the merits based on the record submitted with the motions pursuant to Superior Court Civil Rule 56(h), and that no trial would be necessary. The Court ordered that the Parties submit this stipulation to aid the Court in rendering its decision. With respect to the pending Motions *in Limine*, the Court determined that it would defer any such decision on that until a later time.[1]

The parties stipulated to the following facts:

7.  The Company was incorporated in Delaware on or about August 23, 2013, under the name "Point Medical, Inc.," and later changed its name to "TurnPoint Medical Devices, Inc."

8.  Toedtman was the initial Chairman and President of the Company under its Bylaws and Mr. Joerg Klaube was the initial Secretary and Chief Financial Officer. Toedtman and George Boyajian were the initial directors.

9.  On or about January 3, 2014, the Company entered into a Personal Services Agreement with Toedtman, agreeing to pay him $4,000.00 per month on a consulting basis to serve as interim CEO, which would increase to $150,000 annually if Boyajian did not become CEO by May 31, 2015.

10. On or about December 10, 2014, the Company's directors, John Toedtman and George Boyajian, executed a Unanimous Written Consent which contains a resolution as follows: "RESOLVED, that the management of the Company negotiate, and enter into, employment agreements with John Toedtman, George Boyajian and Jerry Ruddle to serve as officers of the Company" (the "Dec. 10 Consent"). Additionally, the Dec. 10 Consent adopted the following resolution: "RESOLVED, that the proper officers of the Corporation are hereby authorized to take all necessary and proper actions to effectuate the foregoing resolutions adopted by this Board of Directors ...."

11. In December 2014, the Company entered into an employment agreement with Mr. Jerry Ruddle to become the President and COO. At his deposition, Mr. Ruddle testified as follows:

---

[1] Stipulation on Cross-Motions for Summary Judgment, at 1–3 (Oct. 30, 2018) (hereinafter "Joint Stipulation").

**Q [By Plaintiff's Counsel].** Do you remember ever getting a contract with TurnPoint?

**A [By Mr. Ruddle].** Yes. December of 2014.

**Q.** How did that employment contract come about?

**A.** So how did it come about? It was time to step up the relationship between myself and the company and so I provided the boilerplate of the employment agreement to John Toedtman and we negotiated final terms.

**Q.** Where did you get that boilerplate from?

**A.** As I recall, I got it from Jeff Nicholas at Fox Rothschild.

**Q.** Had you reached out to Jeff yourself to get that?

**A.** Yes.

Ruddle Dep. 12:20-13:13.

12. On November 10, 2015, the Board signed a Unanimous Written Consent of Directors (the "Nov. 10 Consent") which provided: "RESOLVED, that the base salary of John Toedtman, Chairman and Chief Executive Officer of the Company, be increased to $240,000 per year, effective October 1, 2015, payable in accordance with applicable company policy."

13. The Nov. 10 Consent further provided, "RESOLVED, that the proper officers of the Corporation are hereby authorized to take all necessary and proper actions to effectuate the foregoing resolutions adopted by this Board of Directors." The Nov. 10 Written Consent was signed by both directors of the Company, Toedtman and Mr. Christopher York.

14. Toedtman and Klaube prepared an employment agreement (the "Employment Agreement" or the "Agreement") between Toedtman and the Company which provided that Toedtman was Chairman and CEO of the Company. One version of the Employment Agreement was signed by Toedtman for himself and by Klaube on behalf of the Company; the version on file with the SEC indicates that was signed by Toedtman both for the Company and for himself. The Employment Agreement is "dated as of November 10, 2015."

15. Toedtman testified at his deposition as follows:

**Q [By Defendant's Counsel].** And on the last page Bates numbered Toedtman 2810 there is a signature of Joerg Klaube, correct?

**A [By Mr. Toedtman].** Correct.

**Q.** And did you ask Joerg to sign this document?

**A.** I reviewed the changes with Joerg in his capacity as a company officer. He was aware that the salary change had been approved by the board as reflected in the minutes of a recent board meeting and he signed the agreement.

**Q.** Did you ask him to sign the agreement?

**A.** Yes.

Toedtman Dep. 27:8-22.

4

16. Toedtman testified at his deposition as follows:

> **Q [By Defendant's Counsel].** So after you completed or after you made the changes to the employment agreement, did you show it to anybody prior to signing it other than Joerg?
> **A [By Mr. Toedtman].** I don't recall.
> **Q.** Did you provide copies of it to any of the board members?
> **A.** The copies of it provided to the board members were in the S-1 registration statement.
> **Q.** Other than the S-1 registration statement, did you provide a copy of it to any of the board members either prior to it being signed or after it being signed?
> **A.** I don't believe so.
> Toedtman Dep. 30:11-31:1.

17. Mr. Klaube testified that he had an employment agreement with TurnPoint. Mr. Klaube testified that the "Ruddle agreement served as a template" for his employment agreement and the Toedtman Employment Agreement. Klaube Dep. 46:23-47:1.

18. On August 11, 2016, a version of the Employment Agreement signed by Toedtman both for himself and on behalf of the Company was filed with the SEC as Exhibit 10.9 to its Form S-1/A Registration Statement (the "S-1/A") with the SEC. Mr. Klaube testified that he prepared this version as part of the filing of the S-1/A:

> **Q [By Plaintiff's Counsel].** Do you know why there's a difference between these two [versions of the employment agreements]?
> **A [By Mr. Klaube].** Yes.
> **Q.** What happened?
> **A.** Okay. The signature.
> **Q.** I'm looking at the signature, yes, so that is a difference.
> **A.** Okay. Initially there was a back-and-forth with counsel at that time. Initially he [counsel] received the PDF files of the signed employment agreement and he said he can't use this; it needs to be a Word document.
> So I remember running this through a translation from PDF to Word.
> **Q.** Yes.
> **A.** And I stripped out the unreadable signatures because they're gobbledygook. I don't know that he had ever converted a document to Word.
> **Q.** Yes, I have done that before.
> **A.** And so I sent the Word document to counsel and he said it has to be signed.
> **Q.** Okay.

5

**A.** Electronically signed. So he sent it back to me and I put in Toedtman's signature. And at that moment I did not connect that the original was signed by me. I put Toedtman's name in the ss and sent it back and that's the way it was filed.

Obviously it was a mistake when I translated the document.

**Q.** So you're the one that put Toedtman's signature in there twice?

**A.** Yes.

Klaube Dep. 38:10-39:20.

19. Toedtman testified as follows:

> **Q [By Defendant's Counsel].** Turn back to the S-1's for a moment. How involved were you in the drafting of the actual S-1 statement?
>
> **A [By Mr. Toedtman].** Very.
>
> **Q.** Would you say that you were the chief drafter?
>
> **A.** That's fair to say.

Toedtman Dep. 66:13-20.

20. The S-1/A, which Toedtman participated in drafting, stated:

> The Company has employment agreements with its chief executive officer and other key executives. Even though we have an employment agreement with our Chief Executive Officer and our Chief Financial Officer, we could not prevent these executives from terminating employment with us. The Company currently has "key man" life insurance on our Chief Executive Officer and on the principal member of Leveraged Developments LLC.

S-1/A at p. 12. The S-1/A, which Toedtman participated in drafting, further stated with respect to Mr. Toedtman:

> Mr. Toedtman has served as a director and as the CEO of the company since August 2013. Prior to that and beginning in May 2011, he was managing partner of Strategy Advisors, LLC. With over 40 years of business experience, Mr. Toedtman has held senior management positions as Group VP of the Metallurgical Group at Engelhard Industries, a Fortune 100 company, and as President and CEO of a number of early stage companies in the diagnostic and medical device fields. He has been on the board of 7 public companies including Vital Signs, Inc. and a number of private companies, and brings substantial experience in M&A, technology transfer and corporate strategy. He was a Managing Director at Bluestone Capital and is presently a Senior Advisor at Griffin Securities. Mr. Toedtman earned a BA in Economics and an MA in International Economics from Georgetown University.

*Id.* at p. 50. The S-1/A "Signatures" page appears as follows: [Image redacted]

*Id.* at pp. 61-62.

21. Regarding signatures on the S-1 documents, Mr. York testified as follows:

> **Q [By Plaintiff's Counsel].** You weren't involved at all in that?
> **A [By Mr. York].** I was not specifically involved in any of the information or the posting of information for the S-1.
> York Dep. 44:9-13. Additionally, Mr. York testified:
> **Q [By Plaintiff's Counsel].** You don't recall signing this document?
> **A [By Mr. York].** No.
> **Q.** So you never signed this document?
> **A.** I don't recall ever signing any of the S-1 documents.
> **Q.** At any point in time did you actually tell any of your directors hey, I didn't sign this?
> **A.** No.
> **Q.** At any point in time did you object to an S-1 being publicly filed that has your signature on it?
> **A.** Well, I believe there was a board authorization to grant the officers of the company the ability to file the S-1. So I'm assuming they used my signature based on that authorization, but I didn't specifically sign each S-1 and amendment as it came through, no.
> **Q.** So you believe right now this S-1 -- do you stand by your signature? Do you approve this document? Did you approve this document?
> **A.** I stand by the resolution that the board passed to give the officers of the company the ability to put the S-1 together and file it with the SEC.
> York Dep. 47:10-48:13.

22. The Company's Form S-1/A, Amendment No. 2, filed February 10, 2017, attached as Exhibit 10.18 "Amendment No. 1 to Employment Agreement" (the "Amendment"). The Amendment was signed by Klaube for the Company and Toedtman for himself. No other person signed the Amendment. The Amendment further stated, "Except for the sentence deleted by this Amendment, the Parties [Toedtman and the Company] hereby reconfirm and ratify all of the other terms and provisions of the [November 10, 2015] Employment Agreement not expressly modified by this Amendment and further confirm their validity and enforceability under applicable law."

23. The Employment Agreement had a three-year term but was earlier terminable in accordance with its terms. It provided for a base salary of $240,000.00, plus eligibility for a bonus and other benefits.

24. Section 10 of the Employment Agreement provides for the payment of "Severance" equal to 12 months' Base Salary payable in accordance with the Company's regular payroll schedule and certain other benefits (as outlined in the Employment Agreement) if Toedtman is terminated "without Cause" as defined in the agreement. The Employment Agreement defines "Severance"— which for Toedtman totals $250,900—as equal to one year Base Salary plus costs for insurance to be paid for by the Company.

25. Mr. R. Douglas Hulse, who became a director of TurnPoint in approximately December 2015, which was subsequent to the date of Toedtman's Employment Agreement, testified as follows:

> **Q [By Plaintiff's Counsel].** Did you know that [Toedtman] had a contract with the company for his position as CEO?
> **A [By Hulse].** I didn't know for a fact, no.
> **Q.** Did you suspect that he had a contract?
> **A.** It certainly would have been normal.
> Hulse Dep. 31:7-12.

26. Mr. Hulse further testified as follows:

> **Q [By Plaintiff's Counsel].** With respect to your coming on board, were you aware that there were other contract executives at the company?
> **A [By Mr. Hulse].** Yes.
> **Q.** Joerg Klaube, were you aware that he had a contract?
> **A.** I wasn't specifically aware of it. Again, a natural assumption.
> **Q.** Were you aware that Jerry Ruddle had a contract?
> **A.** Again, I assumed that he did but didn't know it for a fact.
> **Q.** Why was it a natural assumption?
> **A.** Because that's good corporate practice.
> Hulse Dep. 31:14-32:4.

27. Hulse further testifies as follows:

> **Q [By Plaintiff's Counsel].** When have you seen the [Toedtman] employment agreement, Mr. Hulse?
> **A [By Mr. Hulse].** In the last, certainly within the last year.
> **Q.** Okay. And when was the first time that you had seen the employment agreement with Mr. Toedtman?
> **A.** I think that was the first time.
> **Q.** Can you give me a rough date?
> **A.** It probably was May - June of 2017.
> **Q.** Was it prior to or after Mr. Toedtman's termination from TurnPoint?
> **A.** It was afterwards.
> **Q.** And that was the first time that you had seen it?

8

**A.** Correct.

Hulse Dep. 37:3-18.

28. Mr. Ruddle was copied on an email dated July 9, 2016, which included a copy of an unsigned version of Mr. Toedtman's employment contract. Mr. Ruddle was not a director of the Company at this time.

29. Mr. York testified as follows:

> **Q [By Plaintiff's Counsel].** When you came on the board, by the way, did you review any past minutes of the board of directors?
> **A [By Mr. York].** No.
> **Q.** Did you review any past written consents?
> **A.** No.
> **Q.** Did you review any other corporate documents related to the company's formation?
> **A.** I reviewed the PPM and the pitch deck.
> York Dep. 36:3-14.

30. Mr. York further testified:

> **Q [By Plaintiff's Counsel].** When did you become aware of the [Toedtman employment] agreement?
> **A [By Mr. York].** After John [Toedtman]'s termination.
> **Q.** That was the first time you became aware of it?
> **A.** It's the first time I ever saw John's employment agreement, correct.
> **Q.** And when was that termination? Do you remember?
> **A.** May 10th, 2017.
> **Q.** So that was the first time that you had ever seen the agreement?
> **A.** I saw it after that. It was in June, I believe, a couple of weeks after that.
> **Q.** Were you aware that there was an employment agreement before that in any way?
> **A.** No.
> **Q.** So you had no knowledge that there was an employment agreement?
> **A.** No.
> York Dep. 33:14-34:11.

31. On May 7, 2017, York, a director, sent an email to Toedtman copying his fellow director Mr. R. Douglas Hulse, stating that Toedtman's Employment Agreement was "invalid." York stated that the fact that it was executed by Toedtman "without any board approval or oversight is evidence for making that determination."

9

32. At a meeting on May 10, 2017, the Board terminated Toedtman's employment with the Company "not for Cause." Toedtman testified as follows:

> **Q [By Defendant's Counsel].** At the time you were terminated what was the financial condition of TurnPoint?
> **A [By Mr. Toedtman].** It was dire.
> Toedtman Dep. 72:1-4.

33. Amendment No. 3 of the S-1 ("Amendment No. 3") filed with the SEC on May 15, 2017, five days after Toedtman's termination, contains a subsection entitled "Termination Benefits" to the "employment" section, and included for the first time the following language: "All above mentioned employment agreements contain a severance clause...." Amendment No. 3, p. 52. Amendment No. 3's "Signatures" page appears as follows: [Image redacted]

   *Id.* at pp. 61-62. The November 4, 2015 Unanimous Written Consent of Directors authorized the "officers of the Company" to prepare and file the Registration Statement and authorized "the Chief Executive Officer and the Chief Financial Officer" "to execute, by and in the name of the Company, the Registration Statement and any required amendments and supplements thereto and to file the same with the Commission." Toedtman was no longer Chief Executive Officer at the time of the filing of Amendment No. 3. There was no testimony regarding whether Toedtman was aware of the filing of Amendment No. 3.

34. In a June 20, 2018 letter, the Company's outside counsel, Fox Rothschild, advised Toedtman that the Employment Agreement was "void" or "voidable." The Company did not pay the Severance.

35. Mr. Christopher York is the current chairman of the Company. He became a director of the Company on or about March 6, 2015.

36. Mr. R. Douglas Hulse is a current director of the Company. He became a director of the Company in or about December 2015.

37. Mr. Joerg Klaube was the Chief Financial Officer and Secretary of the Company from at August 23, 2013, until his termination in 2017.

38. Mr. Jerry Ruddle was the Chief Operating Officer and President of the Company from December 15, 2014 until he was promoted to Chief Executive Officer and President in 2017. Prior to December 15, 2014, Mr. Ruddle worked as a 1099 consultant to the Company, starting in February 2014.

39. As of December 10, 2014, the directors of the Company were George Boyajian and Toedtman.

40. As of November 10, 2015, the directors of the Company were Toedtman and York.[2]

## III. THE PARTIES' CONTENTIONS

### A. Plaintiff's Contentions

Plaintiff's overarching contention is that he is entitled to severance payments per the "Severance" section of his employment agreement with TurnPoint because he was terminated without cause.[3] Plaintiff's employment agreement defines severance as "equal to 12 months' Base Salary payable in accordance with the Company's regular payroll schedule and certain other benefits[.]"[4] The employment agreement provides that Plaintiff is entitled to severance payments if he is terminated without cause.[5] Plaintiff contends he was terminated without cause, and that he is owed a total of $250,900 under the severance provision of the employment agreement, which TurnPoint has not paid. Plaintiff seeks to recover the entirety of the owed sum.

Plaintiff argues that the employment agreement is valid because the Board approved TurnPoint's entry into an employment agreement with Plaintiff by way of Unanimous Written Consent on December 10, 2014, and November 10, 2015. By way of these consents, and the Board members' signatures on various Securities and Exchange Commission ("SEC") filings, Plaintiff contends that the Board had direct or constructive knowledge of the agreement, and the agreement is not void or voidable under Delaware Law. Specifically, Plaintiff argues that the agreement falls within the various safe harbor protections of 8 *Del. C.* § 144. In the alternative, Plaintiff asserts he is entitled to recovery under the doctrines of promissory estoppel, unjust enrichment, and quasi-contract. Lastly, Plaintiff argues he is entitled to recover attorneys' fees, expert fees, and costs based on TurnPoint's alleged bad faith conduct,[6] as well as based on TurnPoint's bylaws' indemnification provisions.[7]

---

[2] Joint Stipulation, at 3–17.

[3] Plaintiff's contentions are listed in full, unabridged form in the parties' stipulation of facts. Joint Stipulation, at 18–19.

[4] Joint Stipulation, at 11 ¶20; *see* Employment Agreement between TurnPoint Medical Devices, Inc. and John R. Toedtman, Pla.'s Mot. for Summary Judgment, Ex. A, at 8 §10(b) – Severance (June 8, 2018) (hereinafter "Employment Agreement").

[5] *See* Employment Agreement, at 8 §(c)(iii) – Effects of Termination.

[6] Pla.'s Opening Br. in Support of Mot. for Summary Judgment, at 10; Pla.'s Reply Br., at 6 (Aug. 8, 2018).

[7] Pla.'s Reply Br., at 6.

11

## B. Defendant's Contentions

TurnPoint contends that the employment agreement was voidable under Delaware law and that the Board properly voided the agreement prior to terminating Plaintiff.[8] TurnPoint claims the agreement was never validly authorized, adopted or ratified by disinterred members of the Board pursuant to § 144(a)(1). TurnPoint argues that neither Board Consent served to approve the employment agreement. Thus, without § 144(a) protection, TurnPoint asserts that the agreement was voidable by the Board at its discretion. TurnPoint also argues that Plaintiff has failed to meet his burden to prove fair dealing and fair price, and as such the agreement fails under the entire fairness standard. TurnPoint also contends that Plaintiff wrongfully acted to keep the existence of the employment agreement hidden from the Board. As to Plaintiff's alternative theories of recovery, TurnPoint argues that Plaintiff has failed to carry his burden to demonstrate the elements of each theory. Nor does TurnPoint consider Plaintiff's claim for attorneys' fees and costs valid under the circumstances.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[9] On summary judgment, the Court must view the facts in the light most favorable to the non-moving party.[10] Once a moving party establishes that no material facts are disputed, the non-moving party bears the burden to demonstrate a material fact issue by offering admissible evidence.[11] The non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts."[12] Further, the Court may draw rational inferences from the facts.[13]

Importantly, in the instant case, "where the parties have filed cross-motions for summary judgment and have not presented argument [in any brief or at oral argument] to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation

---

[8] TurnPoint's contentions are listed in full, unabridged form in the parties' stipulation of facts. Joint Stipulation, at 19–22.

[9] Super. Ct. Civ. R. 56(e).

[10] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970).

[11] *See* Super. Ct. Civ. R. 56(e); *see also Phillips v. Del. Power & Light Co.*, 216 A.2d 281, 285 (Del. 1966).

[12] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[13] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99–100 (Del. 1992).

for decision on the merits based on the record submitted with the motions."[14] "When opposing parties make cross-motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[15] "[I]mmaterial factual disputes will not preclude summary judgment."[16] The parties in this case have stipulated that there are no disputes of facts material to the disposition of the cross-motions for summary judgment. The Court now proceeds to "a decision of the merits [of the case] based on the record submitted with the motions."[17]

## V. DISCUSSION

On December 10, 2014, the Board of Directors of TurnPoint passed a Unanimous Written Consent (the "December 2014 Consent"). The December 2014 Consent authorized "management" and "proper officers" of TurnPoint to negotiate with enumerated persons, which included Plaintiff, for the purposes of entering into employment agreements. Based on the Board's resolution, TurnPoint's Chief Financial Officer, and Secretary of the Board, Joerg Klaube undertook the duty to negotiate and enter into an employment agreement with Plaintiff.[18] There is no disagreement that Klaube constituted a "proper officer" and part of management permitted to negotiate employment contracts on behalf of TurnPoint. After discussions between Plaintiff and Klaube, an employment agreement was finalized between Plaintiff and TurnPoint. Klaube signed on behalf of TurnPoint.[19] There is no dispute that the preceding factual scenario occurred. The dispute before the Court is the legal effect that specific process has on the validity of the employment agreement.

### A. 8 Del. C. § 144(a) does not invalidate the employment agreement.

TurnPoint argues that the employment agreement was voidable as a matter of law under 8 *Del. C.* § 144(a). By invoking § 144(a), TurnPoint seeks to invalidate

---

[14] Super. Ct. Civ. R. 56(h).

[15] *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997)

[16] *Brzoska*, 668 A.2d at 1635 (citing *State Farm Mut. Auto. Co. v. Mundorf*, 659 A.2d 215, 217 (Del. 1995)).

[17] Super. Ct. Civ. R. 56(h).

[18] Joerg Klaube served as the Chief Financial Officer and Secretary of TurnPoint from 2013 to 2017. Joint Stipulation, at 17 ¶37.

[19] *Id.* at 5–6.

the transaction based on the involvement of one self-interested director, Plaintiff. TurnPoint views § 144(a) as the sole basis for avoiding per se voidability.

Upon its codification, Section 144 represented the shift away from the common law rule that interested director transactions were voidable solely because an interested director was involved.[20] The intent of § 144 was to provide "safe harbors" for interested director transactions, to prevent the transaction from being void or voidable solely because an interested director was involved.[21] It would be incorrect to say that § 144 offered the exclusive means of validating interested director transactions.[22] Section 144 "merely removes an 'interested director' cloud when its terms are met and provides against invalidation of an agreement 'solely' because such a director or officer is involved."[23] Therefore, contrary to Turnpoint's assertions, failing to land within a safe harbor does not in and of itself invalidate the transaction. If the transaction does not fall into a safe harbor, the Court will still consider the intrinsic fairness of the transaction to determine its validity.[24]

Section 144(a) can provide greater protection for a transaction in three ways. First, the transaction may be approved by a majority of disinterested directors.[25] Second, the transaction may be approved by a majority of disinterested shareholders.[26] Third, the transaction may be shown as entirely fair to the corporation at the time it was authorized by interested directors or shareholders.[27] Upon approval by disinterested directors under § 144(a)(1),[28] or approval by disinterested shareholders under § 144(a)(2),[29] the Court will review the interested transaction under the business judgment rule. The business judgment rule "is as presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was

---

[20] *See Marciano v. Nakash*, 535 A.2d 400, 403 (Del. 1987).
[21] 8 *Del. C.* § 144(a).
[22] *Marciano*, 535 A.2d at 404.
[23] *Fliegler v. Lawrence*, 361 A.2d 218, 222 (Del. 1976).
[24] *Marciano*, 535 A.2d at 404.
[25] 8 *Del. C.* § 144(a)(1).
[26] 8 *Del. C.* § 144(a)(2).
[27] 8 *Del. C.* § 144(a)(3).
[28] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006) (hereinafter *Benihana-II*); *see Cumming on Behalf of New Senior Investment Group, Inc. v. Edens*, 2018 WL 992877, at *20 nn.222–223 (Del. Ch. Feb. 20, 2018); *In re Wheelabrator Technologies, Inc. Shareholders Litigation*, 663 A.2d 1194, 1200 (Del. Ch. 1995).
[29] *Espinoza v. Zuckerberg*, 124 A.3d 47, 63 (Del. Ch. 2015) (quoting *In re Wheelabrator*, 663 A.2d at 1203).

in the best interest of the company."[30] When "neither shareholder ratification or disinterested director approval" can be obtained, the "intrinsic fairness" standard governs an analysis under § 144(a)(3).[31] "The concept of fairness has two basic aspects: fair dealing and fair price."[32] When applying § 144 (a)(3) the Court will not "sanction unfairness" and, importantly, will not invalidate fairness.[33]

1. The transaction falls within the § 144(a)(1) safe harbor because the Board properly delegated its authority to negotiate and enter into employment agreements to management, and management in turn effectuated that delegation.

Section 144(a)(1) of the Delaware General Corporate Law provides a safe harbor for interested director transactions if the "material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors[.]"[34] Therefore, the Court is tasked with identifying the disinterested directors, identifying what facts were disclosed or known to them, and identifying what affirmative actions they took to authorize or ratify the contract.

After TurnPoint's founding, the initial Board consisted of Plaintiff and George Boyajian.[35] Boyajian left his position as a director in September 2015.[36] Afterwards, and at the time Plaintiff's employment agreement was finalized on November 10, 2015, TurnPoint's Board consisted of Plaintiff and Christopher York.[37] Douglas Hulse became a director in December 2015.[38] Jerry Ruddle became a director in 2017.[39] Plaintiff is the interested director in this matter, for it is his employment agreement at issue. At varying times, the disinterested directors included Boyajian,

---

[30] *Benihana-II*, 906 A.2d at 120 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[31] *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 500 (Del. 1990) (citing *Marciano*, 535 A.2d at 405 n.3).

[32] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[33] *Marciano*, 535 A.2d at 405.

[34] 8 *Del. C.* § 144(a)(1). "Under § 144(a)(1), a ratifying disinterested director vote has the same procedural effect as a ratifying disinterested shareholder vote under § 144(a)(2)." *In re Wheelabrator*, 663 A.2d at 1205 n.8.

[35] Joint Stipulation, at 17 ¶39.

[36] Pla.'s Opening Br., at 4.

[37] Joint Stipulation, at 17 ¶40.

[38] *Id.* at 12 ¶25, 17 ¶36.

[39] *Id.* at 17 ¶38.

York, Hulse, and Ruddle. These disinterested directors did not directly participate in the negotiation of Plaintiff's employment agreement. They delegated that power to management.

Delaware boards of directors have the power to delegate certain duties to committees, subcommittees, or other officers as they see fit.[40] This authority to delegate is not unlimited. Directors may not delegate duties which lie "at the heart of the management of the corporation."[41] Consequently, the Court cannot sanction delegations that remove "from directors in a very substantial way their duty to use their own best judgment on management matters."[42] It must be understood, however, that a Board is not expected to "fully immerse itself in the daily complexities of corporate operation."[43] This is recognized by 8 *Del. C.* § 141(a), which states the business and affairs of a Delaware Corporation are managed "by *or* under the direction" of its board.[44] In selecting which matters to be directly involved with, and which it will delegate, "a board's decisions in those areas are entitled to equal consideration as exercises of business judgment."[45] Importantly, one of the responsibilities that Delaware courts have permitted to be delegated, and commonly is delegated, is the setting of executive compensation and severance plans.[46]

In the instant matter, Boyajian, a disinterested director, signed and approved the December 2014 Unanimous Written Consent. The Consent served as an express delegation of the Board's power to negotiate and enter into employment agreements to "management" and further resolved to have the "proper officers" effectuate that delegation.[47] Such a delegation was proper under Delaware law because a disinterested director authorized this delegation and an independent officer acted on

---

[40] 8 *Del. C.* § 141(a).

[41] *Grimes v. Donald*, 673 A.2d 1207, 1214 (Del. 1996) (citing *Chapin v. Benwood*, 402 A.2d 1205, 1210 (Del. Ch. 1979)); *Sample v. Morgan*, 914 A.2d 647, 671 n.77 (Del. Ch. 2007) (citing *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281, 1292 (Del. 1998)).

[42] *Abercrombie v. Davies*, 123 A.2d 893, 899 (Del. Ch. 1952).

[43] *Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 127 (3rd Cir. 1998) (citing 8 *Del. C.* § 141(c)).

[44] 8 *Del. C.* § 141(a) (emphasis added); *see Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985).

[45] *Rosenblatt*, 493 A.2d at 943 (citing *Aronson*, 473 A.2d at 813).

[46] *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 54 (Del. 2006); *see also Godina v. Resinall Intern, Inc.*, 677 F.Supp.2d 560, 569 (D. Conn. 2009); *Schoonejongen*, 143 F.3d at 127; *Grimes*, 673 A.2d at 1215.

[47] Joint Stipulation, at 3 ¶10. The December 2014 Consent directed "management of the Company [to] negotiate, and enter into, employment agreements with John Toedtman, George Boyajian and Jerry Ruddle to serve as officers of the Company." *Id.*

16

behalf of the company to enter into the employment agreement.[48] This delegation did not preclude the Board or any directors from "exercising their statutory powers and fulfilling their fiduciary duties."[49] Nothing in the consent served to limit the directors' ability to involve themselves in the negotiation process or to override management's decisions on the Board's behalf. The directors did not remove themselves in a substantial way from their corporate duties which would warrant interference by this Court.

The Board's decision to delegate is entitled to consideration as an exercise of business judgment. There is no dispute that Klaube, as Chief Financial Officer, was both part of management and a proper officer as contemplated by the December 2014 Consent.[50] It appears to the Court that Klaube was in a unique position within TurnPoint and had specialized knowledge regarding TurnPoint's finances which would allow him to negotiate employment agreements effectively. The Court will not replace the Board's collective wisdom and business judgment with the Court's own judgment. As the Board properly delegated its authority to enter into employment agreements, and the delegation was properly effectuated, Plaintiff's employment agreement falls within the § 144(a)(1) safe harbor. Therefore, the employment agreement was not voidable, and TurnPoint's attempted invalidation of the agreement fails. Plaintiff may enforce the severance provisions of the employment agreement.

The employment agreement defines severance as "equal to 12 months' Base Salary payable in accordance with the Company's regular payroll schedule and certain other benefits[.]"[51] The employment agreement further provides that Plaintiff is entitled to severance payments if he is terminated without cause.[52] It is undisputed that TurnPoint terminated Plaintiff without cause.[53] Plaintiff's determination that he is owed $250,900 under the severance provision is undisputed. As such, the Court finds that Plaintiff is entitled to a judgment in the amount of $250,900.

---

[48] *See In re Walt Disney*, 906 A.2d at 54.

[49] *Grimes*, 673 A.2d at 1214.

[50] Klaube was both Secretary of the Company and Chief Financial Officer from 2013–2017. Joint Stipulation, at 17 ¶37. TurnPoint's bylaws state that the Secretary's powers and duties include those "as may from time to time be assigned to him or her by the Board[.]" TurnPoint's Bylaws, Pla.'s Reply Br., Ex. AA, at 10. Therefore, TurnPoint's bylaws, as well as Delaware law, permit the Board's delegation of power in the December 2014 Consent.

[51] Joint Stipulation, at 11 ¶20; *see* Employment Agreement, at 8 §10(b) – Severance.

[52] *See* Employment Agreement, at 8 §(c)(iii) – Effects of Termination.

[53] Joint Stipulation, at 15 ¶32.

2. The transaction falls within the § 144(a)(3) safe harbor because it was a product of both fair dealing and fair price.[54]

Although the transaction falls within the § 144(a)(1) safe harbor, the Court will address the intrinsic fairness of the transaction as well. The burden is on the interested director to prove entire fairness under § 144(a)(3).[55] The "entire fairness standard is exacting and requires judicial scrutiny regarding both 'fair dealing' and 'fair price.'"[56] Fair dealing focuses upon the conduct of the corporate fiduciaries in effectuating the transaction, "such as its initiation, structure, and negotiation."[57] Fair price "relates to the economic and financial considerations of the [contract], including all relevant factors [such as] assets, market value, earnings, [or] future prospects[.]"[58] The purpose of the analysis is to disavow unfairness and to sanction fairness.

As to fair dealing, deposition testimony indicated that employment agreements "would have been normal," were "good corporate practice," and were a "natural assumption" in corporate governance.[59] It would appear that the company was in a situation in which employment contracts with its executives was necessary. To initiate contract discussions, the Board, which included disinterested director Boyajian, expressly delegated its authority to negotiate employment agreements to management and proper officers. As discussed above, the parties do not dispute that Klaube was a proper officer under the Board's delegation of authority. Again, Klaube's role as Chief Financial Officer gave him specialized knowledge regarding TurnPoint's finances. It seems reasonable and fair for the company's CFO to represent the company in contract negotiations with the future CEO.

---

[54] Neither party has alleged or demonstrated that there was disinterested shareholder approval of the employment agreement, and therefore § 144(a)(2) is inapplicable.

[55] *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1372 (Del. 1995); *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1063 n.26 (Del. Ch. 2015) (citing *Neponist Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979)). To survive careful scrutiny by the Court, Plaintiff bears the "burden of establishing the entire fairness of the transaction[.]" *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989).

[56] *Unitrin*, 651 A.2d at 1371 n.7. "Because the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of [the] litigation." *Id.* at 1371 (citing *Mills Acquisition*, 559 A.2d at 1279).

[57] *Mills Acquisition*, 559 A.2d at 1279; *see also Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Cumming*, 2018 WL 992877, at *24.

[58] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012) (citing *Weinberger*, 457 A.2d at 711).

[59] Joint Stipulation, at 12 ¶25.

The negotiation and structure of the agreement appear to be fair as well. Klaube explained that Ruddle's employment contract served as the template for both Plaintiff's and Klaube's own employment agreements.[60] Other officers' contracts contained severance provisions as well.[61] Plaintiff "reviewed the changes [from the templates] with [Klaube] in [Klaube's] capacity as a company officer. [Klaube] was aware that [Plaintiff's] salary change had been approved by the board[.]"[62] It should be noted that this negotiation process appears to be very similar to the process between Ruddle and Plaintiff, in which Ruddle provided Plaintiff with "the boilerplate of the employment agreement" and then "negotiated final terms" of Ruddle's employment agreement from that starting point.[63]

There is no indication that Plaintiff hid the existence of the employment agreement or otherwise acted in bad faith. At the time the agreement was finalized on November 10, 2015, the Board consisted of York and Plaintiff.[64] That same day, the Board passed a Unanimous Written Consent (the "November 2015 Consent"). The November 2015 Consent does not directly reference Plaintiff's employment agreement, but it authorized an increase in Plaintiff's salary to $240,000, which matched the terms of his employment agreement; a striking coincidence.[65] Thereafter, the agreement was discussed numerous times in TurnPoint's public SEC filings. On August 11, 2016, TurnPoint filed an S-1/A Registration Statement with the SEC.[66] The S-1/A expressly stated that the "Company has employment agreements with its chief executive officer [Plaintiff] and other key executives."[67] An electronic copy of Plaintiff's employment agreement was filed an exhibit to the S-1/A.[68] The S-1/A was signed by Plaintiff, Klaube, and York.[69] A second document,

---

[60] *Id.* at 6 ¶17. Ruddle's employment contract was based on a template of boilerplate language provided by the TurnPoint's outside counsel. *Id.* at 4 ¶11. For Ruddle's contract, Toedtman negotiated on behalf of TurnPoint.

[61] *Id.* at 15 ¶33.

[62] *Id.* at 5 ¶15.

[63] *Id.* at 4 ¶11.

[64] *Id.* at 4–5, ¶¶12–13.

[65] The November 2015 Consent provided "that the base salary of John Toedtman, Chairman and Chief Executive Officer of the Company, be increased to $240,000 per year, effective October 1, 2015, payable in accordance with applicable company policy." Joint Stipulation, at 4 ¶12.

[66] Plaintiff was the "chief drafter" of the S-1/A. *Id.* at 8 ¶19.

[67] *Id.* at 8 ¶20.

[68] *Id.* at 6–7 ¶18. The particular copy of Plaintiff's employment agreement filed with the S-1/A appeared to be signed by Plaintiff on his own behalf and on behalf of the company. This was unlike the original employment agreement, which was signed by Klaube on behalf of the company. Klaube explained at his deposition that this was an error that resulted from the PDF to Word Document conversion. *See id.* at 7 ¶18.

[69] *Id.* at 9 ¶20.

Amendment No. 2 to the S-1/A, was filed on February 10, 2017, which contained an amendment to the employment agreement, attached as an exhibit to the filing.[70] The amended agreement stated that Plaintiff and TurnPoint "reconfirm[ed] and ratif[ied]" the terms of the Plaintiff's November 10, 2015, employment agreement, save one deleted sentence.[71] This amendment was signed by Plaintiff and Klaube.[72] Lastly, there was Amendment No. 3 of the S-1/A, filed on May 15, 2017, five days after Plaintiff's termination. Amendment No. 3 added language to the S-1/A which discussed the existence of severance clauses within the various executive employment agreements. Amendment No. 3 was signed by Plaintiff, Klaube, York, and Hulse.[73] The SEC filings were "provided to the board" and the Board members' signatures are present in the proper locations in the proper format.[74]

Despite the presence of his signature on the S-1/A and Amendment No. 3, York could not "recall ever signing any of the S-1 documents."[75] After several clarifying questions during his deposition, York maintained ignorance as to the reason his signature was present.[76] York claimed that the first time he saw Plaintiff's employment agreement was after Plaintiff's termination, despite the presence of his signature on the SEC filings.[77] Hulse also maintained that the first time he saw Plaintiff's employment agreement was after Plaintiff's termination, despite the presence of his electronic signature on Amendment No. 3 of the S-1/A.[78] Despite their equivocations, it is undisputed that York and Hulse, at the very least, authorized other officers to place their signature on the SEC filings for approval purposes.[79] Without further evidence to the contrary, the Court will presume that York and Hulse

---

[70] *Id.* at 11 ¶22.

[71] *Id.*

[72] *Id.*

[73] *Id.* at 16 ¶33.

[74] *Id.* at 6 ¶16. The SEC requires that signatures "must be in typed form rather than manual format." Signatures, 17 C.F.R. § 232.302 (2018).

[75] Joint Stipulation, at 10 ¶21.

[76] York stated, "Well, I believe there was a board authorization to grant officers of the company the ability to file the S-1. So I'm assuming they used my signature based on that authorization[.]" *Id.* "I didn't specifically sign each S-1 and amendment[.]" *Id.*

[77] *Id.* at 14 ¶30. York's claim is belied by the fact that he emailed Plaintiff on May 7, 2017, prior to Plaintiff's termination, to inform Plaintiff that the employment agreement was void. *Id.* at 15 ¶31. It appears to the Court that the email exchange implies that York was aware of the employment agreement and its terms prior to Plaintiff's termination.

[78] Joint Stipulation, at 13 ¶27. Hulse's claim is likewise contradicted by the presence of the pre-termination email, which he was copied on. *Id.* at 15 ¶31.

[79] *See id.* at 10 ¶21. SEC Regulation S–T "assumes that electronic signatures have been 'executed, adopted or authorized as a signature' by the person whose signature is transmitted electronically." *In re Piranha, Inc.*, 297 B.R. 78, 81–82 (N.D. Tex. June 20, 2003) (quoting 17 C.F.R. § 232.302).

approved their respective signatures to be placed on the SEC filings. It does not appear to the Court that Plaintiff made any attempt to hide the employment agreement. In any event, the parties have agreed that there are no genuine issues of material facts in this regard. Even a cursory reading of the SEC filings would have discovered the employment agreement.

As to fair price, the Board authorized the raise of Plaintiff's salary to match the agreed upon salary and severence in the employment agreement. The Court will not question York's valid exercise of business judgment in approving the salary. To argue unfair price, TurnPoint claims that the company was in dire financial condition when Plaintiff was terminated. Such a claim is irrelevant, and, in any event, is not a genuine issue of material fact. Under § 144(a)(3), the Court is concerned with the fairness of the transaction "as of the time it is authorized, approved or authorized[.]"[80] There is no evidence that the company was in a dire financial situation at the time the employment agreement was finalized and Plaintiff's salary raised.

The Court finds that the employment agreement was intrinsically fair. The Board authorized contract negotiations with several executives, including Plaintiff, and Plaintiff's agreement was based on a common template. The Chief Financial Officer discussed changes made to the agreement with Plaintiff, reviewed the final agreement, and signed on behalf of TurnPoint, per the Board's authorization. Plaintiff undertook no effort to obscure his employment agreement, and instead provided copies of the agreement to the Board and publically filed the agreement with the SEC. Plaintiff's salary was ratified by the Board, and other executives had severance clauses in their agreements. There is nothing manifestly unfair about the agreement which would render it void. This Court will not invalidate the fairness of the transaction. Therefore, the relevant provisions of the agreement are valid and enforceable.

*B. Plaintiff is also entitled to recover under the doctrine of promissory estoppel.*

The Court will also address Plaintiff's first alternative theory of recovery to further illustrate the intrinsic fairness of the employment agreement. Plaintiff argues in the alternative that the doctrine of promissory estoppel permits him to recover. The primary purpose of the promissory estoppel doctrine is to prevent injustice.[81] Under Delaware law a claim for promissory estoppel requires a plaintiff to prove

---

[80] 8 *Del. C.* § 144(a)(3).

[81] *Lord v. Souder*, 748 A.2d 393, 398–99 (Del. 2000) (citing *Chrysler Corp. v. Quimby*, 144 A.2d 123, 133 (Del. 1958)); *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006).

that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[82] The doctrine is designed to protect the legitimate expectations of parties.[83]

First, the negotiations and the finalized employment agreement constituted TurnPoint's promise to Plaintiff. The December 2014 Consent authorized management of TurnPoint to negotiate employment agreements with Plaintiff and other executives. As discussed above, Klaube was part of management who were authorized to negotiate on behalf of TurnPoint. Klaube negotiated the employment agreement with Plaintiff. Klaube signed on behalf of the company. The employment agreement, and all its provisions, served as the promise by TurnPoint to Plaintiff.

Second, as to expectation, it seems counterintuitive for the Court to rule that TurnPoint could not reasonably expect that its promise would induce Plaintiff's actions, especially in light of TurnPoint's acknowledgment that there are no genuine issues of fact as to this issue. According to the December 2014 Consent, the agreement was entered into expressly to induce Plaintiff "to serve as [an] officer[] of the Company[.]"[84] TurnPoint entered into employment agreements with the other executives as well. There can be no other logical holding than TurnPoint intended to induce Plaintiff to remain as CEO.

Third, it appears to the Court that Plaintiff's reliance on the promise was reasonable. The Board authorized and directed management to enter into these types of agreements. Contracts of this nature are routine for corporate governance.[85] Ruddle's previously negotiated contract served as the template for Plaintiff's and Klaube's. Plaintiff provided a copy of the employment agreement to the members of the Board with the S-1/A filing, and heard no objections from other directors. The Board also agreed to raise Plaintiff's salary. All of these factors give weight to the reasonability of Plaintiff's reliance on the promise. The Court does not see any evidence to suggest that Plaintiff's reliance on the employment agreement was unreasonable, especially in light of the parties' acknowledgment that there are no genuine disputes of material fact.

---

[82] *Lord*, 748 A.2d at 399.
[83] *Ramone*, 2006 WL 905347, at *14.
[84] Joint Stipulation, at 3 ¶10.
[85] *Id.* at 12 ¶25.

22

The final consideration is whether injustice may be prevented only by enforcing the promise. The employment agreement was entered into pursuant to a Board consent. The Board approved Plaintiff's salary raise to match the agreement. Plaintiff thereafter distributed the employment agreement to other directors, and heard no objection. Plaintiff publically filed the agreement with the SEC. Turnpoint offered Plaintiff a safety net, and promised to pay "'[s]everance' equal to 12 months' Base Salary payable in accordance with the Company's regular payroll schedule and certain other benefits … if Toedtman is terminated 'without Cause[.]'"[86] In return for that safety net, Plaintiff remained on as CEO of TurnPoint for several years. In theory, the severance clause would protect Plaintiff in the event of "termination without Cause."[87] When just such a termination occurred, TurnPoint immediately sought to invalidate the valid agreement to avoid its contractual obligation after-the-fact.[88] In this situation, justice requires that the promised benefits must be recoverable by Plaintiff.

Plaintiff established each of the factors necessary to satisfy a claim for recovery under promissory estoppel. The provisions of the employment agreement relating to termination, severance, and related benefits are enforceable, and Plaintiff can recover pursuant to those provisions in the amount of $250,900. Because the Court finds that the Plaintiff established the alternative theory of recovery under promissory estoppel, and that the employment agreement was not voidable pursuant to § 144(a), the Court does not feel it is necessary to address Plaintiff's other alternative theories of recovery.

C. *Plaintiff has not demonstrated Defendant acted in bad faith which would warrant an award of attorneys' fees.*

Plaintiff seeks recovery of attorneys' fees, expert fees, and costs in connection with this matter based on Defendant's alleged "bad faith[.]"[89] Plaintiff argues that Defendant's conduct, which forced Plaintiff to incur "tens of thousands of dollars in attorneys' fees, expert fees, and costs and delaying payment of severance to a former employee[,]" amount to bad faith.[90] In further support of the bad faith argument, Plaintiff alleges that Defendant's factual arguments contradicted undisputed evidence to the contrary, and Defendant's legal arguments contradicted case law.[91]

---

[86] *Id.* at 11 ¶24.
[87] *Id.*
[88] *Id.* at 15 ¶¶31–32.
[89] *Id.* at 19 ¶46.
[90] Pla.'s Reply Br., at 6.
[91] *See id.*

Plaintiff acknowledges that there are no genuine disputes of fact which are material to a disposition of this issue.

Under the American Rule, generally followed by Delaware courts, "each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[92] As such, courts are typically wary of awarding attorney fees to litigants without a showing of exceptional circumstances. One of the exceptional circumstances is the bad faith exception.[93] As the Delaware Supreme Court has observed, "there is no single definition of bad faith conduct."[94] Courts have routinely found bad faith where the parties "have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[95] The exception does not apply "to conduct that gives rise to the substantive claim itself.[96] However, the Court may consider pre-litigation conduct for the purpose of determining whether the defendant thereafter defended the action in bad faith.[97]

Plaintiff has not provided the Court enough evidence to support a finding of bad faith. There is no indication of falsified records, false testimony, unnecessary delays, or frivolously asserted claims. While Defendant's conduct may have, at times, caused frustration for Plaintiff, it does not rise to the level of egregiousness required to obtain a reward under Delaware law. As to TurnPoint's legal argument challenging the validity of Plaintiff's employment agreement, any deficiencies amount to a misapplication of Delaware corporate law. Such a mistaken belief in the correctness of one's argument does not make the claims so frivolous as to warrant an award of attorneys' fees. Without more direct evidence of bad faith misconduct, the Court will not award attorneys' fees under the bad faith exception.

---

[92] *Jonston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[93] *Id.* "The United States Supreme Court has used the bad faith exception to the American Rule to uphold the award of attorneys fees." *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 57 (1991)). The Delaware Supreme Court has also used the bad faith conduct of a party as a valid exception. *See Brice v. State of Delaware, Dept. of Correction*, 704 A.2d 1176, 1179 (Del. 1998).

[94] *Arbitrium*, 720 A.2d at 546.

[95] *Id.* at 546 nn.25–27; *see Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) (finding that attorneys' fees could be awarded as sanctions under rule relating to failure to comply with discovery); *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1243 (10th Cir. 1988) (finding no bad faith because there was insufficient proof that documents in question were falsified).

[96] *Arbitrium*, 720 A.2d at 546; *see Shimman v. Int'l Union of Operating Eng'rs Local 18*, 744 F.2d 1226, 1230 (6th Cir. 1984), *cert. denied* 469 U.S. 1215 (1985) (stating that courts should take care to distinguish between the defendant's bad faith in maintaining the action from the acts that gave rise to the action).

[97] *See Arbitrium*, 720 A.2d at 546 ("The Court of Chancery … found that the conduct of the Defendants rose to the level of bad faith because they had no valid defense and knew it.").

*D. The Superior Court lacks jurisdiction to determine a claim for indemnification under TurnPoint's bylaws or under Title 8 of the Delaware Code.*

Plaintiff cannot seek indemnification under the provisions of TurnPoint's bylaws through an action in Superior Court. Title 8, Section 145(k) vests the Court of Chancery with "exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise."[98] By stating that a particular court has exclusive jurisdiction over a particular action, "the General Assembly makes clear which of Delaware trial courts will handle the identified matter[.]"[99] The Court will note that the parties did not address the applicability or non-applicability of 8 *Del. C.* § 145(k) in the briefs or at oral argument, but the language of § 145(k) is clear. Plaintiff's action for indemnification is a matter that may heard and determined solely by the Court of Chancery. This Court lacks jurisdiction. Therefore, Plaintiff's instant action for indemnification will be dismissed.

## CONCLUSION

The Court's decision on this matter has been premised on the procedural posture created by the parties' filing of cross-motions for summary judgment, pursuant to Superior Court Rule of Civil Procedure 56(h). Therefore, based on a review of the record under that procedural posture, and for the foregoing reasons, Plaintiff's Cross-Motion for Summary Judgment is **GRANTED IN PART.** Plaintiff's claim for indemnification under TurnPoint's bylaws is **DISMISSED.** Defendant's Cross-Motion for Summary Judgment is **DENIED.** The effect of the Court's ruling on these cross-motions for summary judgment is a ruling on the merits of the case in favor of Plaintiff. Judgment is ordered in the amount of $250,900.

**IT IS SO ORDERED.**

Richard R. Cooch, R.J.

cc:     Prothonotary

---

[98] 8 *Del. C.* § 145(k).
[99] *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 938 (Del. Ch. 2014).

25